# BARNES, PROSECUTING ATTORNEY OF ST. JOSEPH COUNTY, INDIANA, ET AL. *v.* GLEN THEATRE, INC., ET AL.

No. 90–26.   Argued January 8, 1991—Decided June 21, 1991

*Wayne E. Uhl,* Deputy Attorney General of Indiana, argued the cause for petitioners. With him on the briefs was *Linley E. Pearson,* Attorney General.

*Bruce J. Ennis, Jr.,* argued the cause for respondents. *Lee J. Klein* and *Bradley J. Shafer* filed a brief for respondents Glen Theatre, Inc., et al. *Patrick Louis Baude* and *Charles A. Asher* filed a brief for respondents Darlene Miller et al.*

CHIEF JUSTICE REHNQUIST announced the judgment of the Court and delivered an opinion, in which JUSTICE O'CONNOR and JUSTICE KENNEDY join.

Respondents are two establishments in South Bend, Indiana, that wish to provide totally nude dancing as entertainment, and individual dancers who are employed at these

---

*Briefs of *amici curiae* urging reversal were filed for the State of Arizona et al. by *Robert K. Corbin,* Attorney General of Arizona, and *Steven J. Twist,* Chief Assistant Attorney General, *Clarine Nardi Riddle,* Attorney General of Connecticut, and *John J. Kelly,* Chief State's Attorney, *William L. Webster,* Attorney General of Missouri, *Lacy H. Thornburg,* Attorney General of North Carolina, and *Rosalie Simmonds Ballentine,* Acting Attorney General of the Virgin Islands; for the American Family Association, Inc., et al. by *Alan E. Sears, James Mueller,* and *Peggy M. Coleman;* and for the National Governors' Association et al. by *Benna Ruth Solomon* and *Peter Buscemi.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Spencer Neth, Thomas D. Buckley, Jr., Steven R. Shapiro,* and *John A. Powell;* for the Georgia on Premise & Lounge Association, Inc., by *James A. Walrath;* for People for the American Way et al. by *Timothy B. Dyk, Robert H. Klonoff, Patricia A. Dunn, Elliot M. Mincberg, Stephen F. Rohde,* and *Mary D. Dorman.*

*James J. Clancy* filed a brief *pro se* as *amicus curiae.*

establishments. They claim that the First Amendment's guarantee of freedom of expression prevents the State of Indiana from enforcing its public indecency law to prevent this form of dancing. We reject their claim.

The facts appear from the pleadings and findings of the District Court and are uncontested here. The Kitty Kat Lounge, Inc. (Kitty Kat), is located in the city of South Bend. It sells alcoholic beverages and presents "go-go dancing." Its proprietor desires to present "totally nude dancing," but an applicable Indiana statute regulating public nudity requires that the dancers wear "pasties" and "G-strings" when they dance. The dancers are not paid an hourly wage, but work on commission. They receive a 100 percent commission on the first $60 in drink sales during their performances. Darlene Miller, one of the respondents in the action, had worked at the Kitty Kat for about two years at the time this action was brought. Miller wishes to dance nude because she believes she would make more money doing so.

Respondent Glen Theatre, Inc., is an Indiana corporation with a place of business in South Bend. Its primary business is supplying so-called adult entertainment through written and printed materials, movie showings, and live entertainment at an enclosed "bookstore." The live entertainment at the "bookstore" consists of nude and seminude performances and showings of the female body through glass panels. Customers sit in a booth and insert coins into a timing mechanism that permits them to observe the live nude and seminude dancers for a period of time. One of Glen Theatre's dancers, Gayle Ann Marie Sutro, has danced, modeled, and acted professionally for more than 15 years, and in addition to her performances at the Glen Theatre, can be seen in a pornographic movie at a nearby theater. App. to Pet. for Cert. 131–133.

Respondents sued in the United States District Court for the Northern District of Indiana to enjoin the enforcement of the Indiana public indecency statute, Ind. Code § 35–45–4–1

(1988), asserting that its prohibition against complete nudity in public places violated the First Amendment. The District Court originally granted respondents' prayer for an injunction, finding that the statute was facially overbroad. The Court of Appeals for the Seventh Circuit reversed, deciding that previous litigation with respect to the statute in the Supreme Court of Indiana and this Court precluded the possibility of such a challenge,[1] and remanded to the District Court in order for the plaintiffs to pursue their claim that the statute violated the First Amendment as applied to their dancing. *Glen Theatre, Inc.* v. *Pearson*, 802 F. 2d 287, 288–290 (1986). On remand, the District Court concluded that

---

[1] The Indiana Supreme Court appeared to give the public indecency statute a limiting construction to save it from a facial overbreadth attack:

"There is no right to appear nude in public. Rather, it *may* be constitutionally required to tolerate or to allow some nudity as a part of some larger form of expression meriting protection, when the communication of ideas is involved." *State* v. *Baysinger*, 272 Ind. 236, 247, 397 N. E. 2d 580, 587 (1979) (emphasis added), appeals dism'd *sub nom. Clark* v. *Indiana*, 446 U. S. 931, and *Dove* v. *Indiana*, 449 U. S. 806 (1980).

Five years after *Baysinger*, however, the Indiana Supreme Court reversed a decision of the Indiana Court of Appeals holding that the statute did "not apply to activity such as the theatrical appearances involved herein, which may not be prohibited absent a finding of obscenity," in a case involving a partially nude dance in the "Miss Erotica of Fort Wayne" contest. *Erhardt* v. *State*, 468 N. E. 2d 224 (Ind. 1984). The Indiana Supreme Court did not discuss the constitutional issues beyond a cursory comment that the statute had been upheld against constitutional attack in *Baysinger*, and Erhardt's conduct fell within the statutory prohibition. Justice Hunter dissented, arguing that "a public indecency statute which prohibits nudity in any public place is unconstitutionally overbroad. My reasons for so concluding have already been articulated in *State* v. *Baysinger*, (1979) 272 Ind. 236, 397 N. E. 2d 580 (Hunter and DeBruler, JJ., dissenting)." 468 N. E. 2d, at 225–226. Justice DeBruler expressed similar views in his dissent in *Erhardt*. *Id.*, at 226. Therefore, the Indiana Supreme Court did not affirmatively limit the reach of the statute in *Baysinger*, but merely said that to the extent the First Amendment would require it, the statute might be unconstitutional as applied to some activities.

"the type of dancing these plaintiffs wish to perform is not expressive activity protected by the Constitution of the United States," and rendered judgment in favor of the defendants. *Glen Theatre, Inc.* v. *Civil City of South Bend*, 695 F. Supp. 414, 419 (1988). The case was again appealed to the Seventh Circuit, and a panel of that court reversed the District Court, holding that the nude dancing involved here was expressive conduct protected by the First Amendment. *Miller* v. *Civil City of South Bend*, 887 F. 2d 826 (1989). The Court of Appeals then heard the case en banc, and the court rendered a series of comprehensive and thoughtful opinions. The majority concluded that nonobscene nude dancing performed for entertainment is expression protected by the First Amendment, and that the public indecency statute was an improper infringement of that expressive activity because its purpose was to prevent the message of eroticism and sexuality conveyed by the dancers. *Miller* v. *Civil City of South Bend*, 904 F. 2d 1081 (1990). We granted certiorari, 498 U. S. 807 (1990), and now hold that the Indiana statutory requirement that the dancers in the establishments involved in this case must wear pasties and G-strings does not violate the First Amendment.

Several of our cases contain language suggesting that nude dancing of the kind involved here is expressive conduct protected by the First Amendment. In *Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 932 (1975), we said: "[A]lthough the customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression, we recognized in *California* v. *LaRue*, 409 U. S. 109, 118 (1972), that this form of entertainment might be entitled to First and Fourteenth Amendment protection under some circumstances." In *Schad* v. *Mount Ephraim*, 452 U. S. 61, 66 (1981), we said that "[f]urthermore, as the state courts in this case recognized, nude dancing is not without its First Amendment protections from official regulation" (citations omitted). These statements support the conclusion of the Court of Appeals

that nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so. This, of course, does not end our inquiry. We must determine the level of protection to be afforded to the expressive conduct at issue, and must determine whether the Indiana statute is an impermissible infringement of that protected activity.

Indiana, of course, has not banned nude dancing as such, but has proscribed public nudity across the board. The Supreme Court of Indiana has construed the Indiana statute to preclude nudity in what are essentially places of public accommodation such as the Glen Theatre and the Kitty Kat Lounge. In such places, respondents point out, minors are excluded and there are no nonconsenting viewers. Respondents contend that while the State may license establishments such as the ones involved here, and limit the geographical area in which they do business, it may not in any way limit the performance of the dances within them without violating the First Amendment. The petitioners contend, on the other hand, that Indiana's restriction on nude dancing is a valid "time, place, or manner" restriction under cases such as *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984).

The "time, place, or manner" test was developed for evaluating restrictions on expression taking place on public property which had been dedicated as a "public forum," *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989), although we have on at least one occasion applied it to conduct occurring on private property. See *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986). In *Clark* we observed that this test has been interpreted to embody much the same standards as those set forth in *United States* v. *O'Brien*, 391 U. S. 367 (1968), and we turn, therefore, to the rule enunciated in *O'Brien*.

O'Brien burned his draft card on the steps of the South Boston Courthouse in the presence of a sizable crowd, and

was convicted of violating a statute that prohibited the knowing destruction or mutilation of such a card. He claimed that his conviction was contrary to the First Amendment because his act was "symbolic speech"—expressive conduct. The Court rejected his contention that symbolic speech is entitled to full First Amendment protection, saying:

> "[E]ven on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.*, at 376–377 (footnotes omitted).

Applying the four-part *O'Brien* test enunciated above, we find that Indiana's public indecency statute is justified despite its incidental limitations on some expressive activity. The public indecency statute is clearly within the constitutional power of the State and furthers substantial governmental interests. It is impossible to discern, other than from the text of the statute, exactly what governmental interest the Indiana legislators had in mind when they enacted

this statute, for Indiana does not record legislative history, and the State's highest court has not shed additional light on the statute's purpose. Nonetheless, the statute's purpose of protecting societal order and morality is clear from its text and history. Public indecency statutes of this sort are of ancient origin and presently exist in at least 47 States. Public indecency, including nudity, was a criminal offense at common law, and this Court recognized the common-law roots of the offense of "gross and open indecency" in *Winters* v. *New York*, 333 U. S. 507, 515 (1948). Public nudity was considered an act *malum in se*. *Le Roy* v. *Sidley*, 1 Sid. 168, 82 Eng. Rep. 1036 (K. B. 1664). Public indecency statutes such as the one before us reflect moral disapproval of people appearing in the nude among strangers in public places.

This public indecency statute follows a long line of earlier Indiana statutes banning all public nudity. The history of Indiana's public indecency statute shows that it predates barroom nude dancing and was enacted as a general prohibition. At least as early as 1831, Indiana had a statute punishing "open and notorious lewdness, or . . . any grossly scandalous and public indecency." Rev. Laws of Ind., ch. 26, § 60 (1831); Ind. Rev. Stat., ch. 53, § 81 (1834). A gap during which no statute was in effect was filled by the Indiana Supreme Court in *Ardery* v. *State*, 56 Ind. 328 (1877), which held that the court could sustain a conviction for exhibition of "privates" in the presence of others. The court traced the offense to the Bible story of Adam and Eve. *Id.*, at 329–330. In 1881, a statute was enacted that would remain essentially unchanged for nearly a century:

> "Whoever, being over fourteen years of age, makes an indecent exposure of his person in a public place, or in any place where there are other persons to be offended or annoyed thereby, . . . is guilty of public indecency . . . ." 1881 Ind. Acts, ch. 37, § 90.

The language quoted above remained unchanged until it was simultaneously repealed and replaced with the present statute in 1976. 1976 Ind. Acts, Pub. L. 148, Art. 45, ch. 4, § 1.[2]

This and other public indecency statutes were designed to protect morals and public order. The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and we have upheld such a basis for legislation. In *Paris Adult Theatre I* v. *Slaton*, 413 U. S. 49, 61 (1973), we said:

> "In deciding *Roth* [v. *United States*, 354 U. S. 476 (1957)], this Court implicitly accepted that a legislature could legitimately act on such a conclusion to protect 'the social interest in order and morality.' *[Id.]*, at 485." (Emphasis omitted.)

And in *Bowers* v. *Hardwick*, 478 U. S. 186, 196 (1986), we said:

> "The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed."

Thus, the public indecency statute furthers a substantial government interest in protecting order and morality.

---

[2] Indiana Code § 35–45–4–1 (1988) provides:

"Public indecency; indecent exposure

"Sec. 1.   (a) A person who knowingly or intentionally, in a public place:
   "(1) engages in sexual intercourse;
   "(2) engages in deviate sexual conduct;
   "(3) appears in a state of nudity; or
   "(4) fondles the genitals of himself or another person;
commits public indecency, a Class A misdemeanor.

"(b) 'Nudity' means the showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state."

This interest is unrelated to the suppression of free expression. Some may view restricting nudity on moral grounds as necessarily related to expression. We disagree. It can be argued, of course, that almost limitless types of conduct—including appearing in the nude in public—are "expressive," and in one sense of the word this is true. People who go about in the nude in public may be expressing something about themselves by so doing. But the court rejected this expansive notion of "expressive conduct" in *O'Brien*, saying:

> "We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 391 U. S., at 376.

And in *Dallas* v. *Stanglin*, 490 U. S. 19 (1989), we further observed:

> "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment. We think the activity of these dance-hall patrons—coming together to engage in recreational dancing—is not protected by the First Amendment." *Id.*, at 25.

Respondents contend that even though prohibiting nudity in public generally may not be related to suppressing expression, prohibiting the performance of nude dancing is related to expression because the State seeks to prevent its erotic message. Therefore, they reason that the application of the Indiana statute to the nude dancing in this case violates the First Amendment, because it fails the third part of the *O'Brien* test, viz: the governmental interest must be unrelated to the suppression of free expression.

But we do not think that when Indiana applies its statute to the nude dancing in these nightclubs it is proscribing nudity because of the erotic message conveyed by the dancers.

Presumably numerous other erotic performances are presented at these establishments and similar clubs without any interference from the State, so long as the performers wear a scant amount of clothing. Likewise, the requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic. The perceived evil that Indiana seeks to address is not erotic dancing, but public nudity. The appearance of people of all shapes, sizes and ages in the nude at a beach, for example, would convey little if any erotic message, yet the State still seeks to prevent it. Public nudity is the evil the State seeks to prevent, whether or not it is combined with expressive activity.

This conclusion is buttressed by a reference to the facts of *O'Brien*. An Act of Congress provided that anyone who knowingly destroyed a Selective Service registration certificate committed an offense. O'Brien burned his certificate on the steps of the South Boston Courthouse to influence others to adopt his antiwar beliefs. This Court upheld his conviction, reasoning that the continued availability of issued certificates served a legitimate and substantial purpose in the administration of the Selective Service System. O'Brien's deliberate destruction of his certificate frustrated this purpose and "[f]or this noncommunicative impact of his conduct, and for nothing else, he was convicted." 391 U. S., at 382. It was assumed that O'Brien's act in burning the certificate had a communicative element in it sufficient to bring into play the First Amendment, *id.*, at 376, but it was for the noncommunicative element that he was prosecuted. So here with the Indiana statute; while the dancing to which it was applied had a communicative element, it was not the dancing that was prohibited, but simply its being done in the nude.

The fourth part of the *O'Brien* test requires that the incidental restriction on First Amendment freedom be no greater than is essential to the furtherance of the governmental interest. As indicated in the discussion above, the

governmental interest served by the text of the prohibition is societal disapproval of nudity in public places and among strangers. The statutory prohibition is not a means to some greater end, but an end in itself. It is without cavil that the public indecency statute is "narrowly tailored"; Indiana's requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose.

The judgment of the Court of Appeals accordingly is

*Reversed.*

JUSTICE SCALIA, concurring in the judgment.

I agree that the judgment of the Court of Appeals must be reversed. In my view, however, the challenged regulation must be upheld, not because it survives some lower level of First Amendment scrutiny, but because, as a general law regulating conduct and not specifically directed at expression, it is not subject to First Amendment scrutiny at all.

I

Indiana's public indecency statute provides:

"(a) A person who knowingly or intentionally, in a public place:
"(1) engages in sexual intercourse;
"(2) engages in deviate sexual conduct;
"(3) appears in a state of nudity; or
"(4) fondles the genitals of himself or another person;
commits public indecency, a Class A misdemeanor.
"(b) 'Nudity' means the showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of covered male genitals in a discernibly turgid state." Ind. Code § 35–45–4–1 (1988).

On its face, this law is not directed at expression in particular. As Judge Easterbrook put it in his dissent below: "Indi-

ana does not regulate dancing. It regulates public nudity. . . . Almost the entire domain of Indiana's statute is unrelated to expression, unless we view nude beaches and topless hot dog vendors as speech." *Miller* v. *Civil City of South Bend,* 904 F. 2d 1081, 1120 (CA7 1990). The intent to convey a "message of eroticism" (or any other message) is not a necessary element of the statutory offense of public indecency; nor does one commit that statutory offense by conveying the most explicit "message of eroticism," so long as he does not commit any of the four specified acts in the process.[1]

Indiana's statute is in the line of a long tradition of laws against public nudity, which have never been thought to run afoul of traditional understanding of "the freedom of speech." Public indecency—including public nudity—has long been an offense at common law. See 50 Am. Jur. 2d, Lewdness, Indecency, and Obscenity § 17, pp. 449, 472–474 (1970); Annot., Criminal offense predicated on indecent exposure, 93 A. L. R. 996, 997–998 (1934); *Winters* v. *New York,* 333 U. S. 507, 515 (1948). Indiana's first public nudity statute, Rev. Laws of Ind., ch. 26, § 60 (1831), predated by many years the appearance of nude barroom dancing. It was general in scope, directed at all public nudity, and not just at public nude expression; and all succeeding statutes, down to

---

[1] Respondents assert that the statute cannot be characterized as a general regulation of conduct, unrelated to suppression of expression, because one defense put forward in oral argument below by the attorney general referred to the "message of eroticism" conveyed by respondents. But that argument seemed to go to whether the statute could constitutionally be applied to the present performances, rather than to what was the purpose of the legislation. Moreover, the State's argument below was in the alternative: (1) that the statute does not implicate the First Amendment because it is a neutral rule not directed at expression, and (2) that the statute in any event survives First Amendment scrutiny because of the State's interest in suppressing nude barroom dancing. The second argument can be claimed to contradict the first (though I think it does not); but it certainly does not waive or abandon it. In any case, the clear purpose shown by both the text and historical use of the statute cannot be refuted by a litigating statement in a single case.

the present one, have been the same. Were it the case that Indiana *in practice* targeted only expressive nudity, while turning a blind eye to nude beaches and unclothed purveyors of hot dogs and machine tools, see *Miller*, 904 F. 2d, at 1120, 1121, it might be said that what posed as a regulation of conduct in general was in reality a regulation of only communicative conduct. Respondents have adduced no evidence of that. Indiana officials have brought many public indecency prosecutions for activities having no communicative element. See *Bond* v. *State*, 515 N. E. 2d 856, 857 (Ind. 1987); *In re Levinson*, 444 N. E. 2d 1175, 1176 (Ind. 1983); *Preston* v. *State*, 259 Ind. 353, 354–355, 287 N. E. 2d 347, 348 (1972); *Thomas* v. *State*, 238 Ind. 658, 659–660, 154 N. E. 2d 503, 504–505 (1958); *Blanton* v. *State*, 533 N. E. 2d 190, 191 (Ind. App. 1989); *Sweeney* v. *State*, 486 N. E. 2d 651, 652 (Ind. App. 1985); *Thompson* v. *State*, 482 N. E. 2d 1372, 1373–1374 (Ind. App. 1985); *Adims* v. *State*, 461 N. E. 2d 740, 741–742 (Ind. App. 1984); *State* v. *Elliott*, 435 N. E. 2d 302, 304 (Ind. App. 1982); *Lasko* v. *State*, 409 N. E. 2d 1124, 1126 (Ind. App. 1980).[2]

The dissent confidently asserts, *post*, at 590–591, that the purpose of restricting nudity in public places in general is to protect nonconsenting parties from offense; and argues that since only consenting, admission-paying patrons see respondents dance, that purpose cannot apply and the only remaining purpose must relate to the communicative elements of the performance. Perhaps the dissenters believe that "offense to others" *ought* to be the only reason for restricting nudity in public places generally, but there is no

---

[2] Respondents also contend that the statute, as interpreted, is not content neutral in the expressive conduct to which it applies, since it allegedly does not apply to nudity in theatrical productions. See *State* v. *Baysinger*, 272 Ind. 236, 247, 397 N. E. 2d 580, 587 (1979). I am not sure that theater versus nontheater represents a distinction based on content rather than format, but assuming that it does, the argument nonetheless fails for the reason the plurality describes, *ante*, at 564, n. 1.

basis for thinking that our society has ever shared that Thoreauvian "you-may-do-what-you-like-so-long-as-it-does-not-injure-someone-else" beau ideal—much less for thinking that it was written into the Constitution. The purpose of Indiana's nudity law would be violated, I think, if 60,000 fully consenting adults crowded into the Hoosier Dome to display their genitals to one another, even if there were not an offended innocent in the crowd. Our society prohibits, and all human societies have prohibited, certain activities not because they harm others but because they are considered, in the traditional phrase, *"contra bonos mores,"* *i. e.,* immoral. In American society, such prohibitions have included, for example, sadomasochism, cockfighting, bestiality, suicide, drug use, prostitution, and sodomy. While there may be great diversity of view on whether various of these prohibitions should exist (though I have found few ready to abandon, in principle, all of them), there is no doubt that, absent specific constitutional protection for the conduct involved, the Constitution does not prohibit them simply because they regulate "morality." See *Bowers* v. *Hardwick,* 478 U. S. 186, 196 (1986) (upholding prohibition of private homosexual sodomy enacted solely on "the presumed belief of a majority of the electorate in [the jurisdiction] that homosexual sodomy is immoral and unacceptable"). See also *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 68, n. 15 (1973); *Dronenburg* v. *Zech,* 239 U. S. App. D. C. 229, 238, and n. 6, 741 F. 2d 1388, 1397, and n. 6 (1984) (opinion of Bork, J.). The purpose of the Indiana statute, as both its text and the manner of its enforcement demonstrate, is to enforce the traditional moral belief that people should not expose their private parts indiscriminately, regardless of whether those who see them are disedified. Since that is so, the dissent has no basis for positing that, where only thoroughly edified adults are present, the purpose must be repression of communication.[3]

---

[3] The dissent, *post,* at 590, 595–596, also misunderstands what is meant by the term "general law." I do not mean that the law restricts the tar-

## II

Since the Indiana regulation is a general law not specifically targeted at expressive conduct, its application to such conduct does not in my view implicate the First Amendment.

The First Amendment explicitly protects "the freedom of speech [and] of the press"—oral and written speech—not "expressive conduct." When any law restricts speech, even for a purpose that has nothing to do with the suppression of communication (for instance, to reduce noise, see *Saia* v. *New York*, 334 U. S. 558, 561 (1948), to regulate election campaigns, see *Buckley* v. *Valeo*, 424 U. S. 1, 16 (1976), or to prevent littering, see *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147, 163 (1939)), we insist that it meet the high, First Amendment standard of justification. But virtually *every* law restricts conduct, and virtually *any* prohibited conduct can be performed for an expressive purpose—if only expressive of the fact that the actor disagrees with the prohibition. See, *e. g.*, *Florida Free Beaches, Inc.* v. *Miami*, 734 F. 2d 608, 609 (CA11 1984) (nude sunbathers challenging public indecency law claimed their "message" was that nudity is not indecent). It cannot reasonably be demanded, therefore, that every restriction of expression incidentally produced by a general law regulating conduct pass normal First Amendment scrutiny, or even—as some of our cases have suggested, see, *e. g.*, *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968)—that it be justified by an "important or sub-

---

geted conduct in all places at all times. A law is "general" for the present purposes if it regulates conduct without regard to whether that conduct is expressive. Concededly, Indiana bans nudity in public places, but not within the privacy of the home. (That is not surprising, since the common-law offense, and the traditional moral prohibition, runs against *public* nudity, not against all nudity. *E. g.*, 50 Am. Jur. 2d, Lewdness, Indecency, and Obscenity § 17, pp. 472–474 (1970)). But that confirms, rather than refutes, the general nature of the law: One may not go nude in public, whether or not one intends thereby to convey a message, and similarly one *may* go nude in private, again whether or not that nudity is expressive.

stantial" government interest. Nor do our holdings require such justification: We have never invalidated the application of a general law simply because the conduct that it reached was being engaged in for expressive purposes and the government could not demonstrate a sufficiently important state interest.

This is not to say that the First Amendment affords no protection to expressive conduct. Where the government prohibits conduct *precisely because of its communicative attributes*, we hold the regulation unconstitutional. See, *e. g., United States* v. *Eichman*, 496 U. S. 310 (1990) (burning flag); *Texas* v. *Johnson*, 491 U. S. 397 (1989) (same); *Spence* v. *Washington*, 418 U. S. 405 (1974) (defacing flag); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969) (wearing black arm bands); *Brown* v. *Louisiana*, 383 U. S. 131 (1966) (participating in silent sit-in); *Stromberg* v. *California*, 283 U. S. 359 (1931) (flying a red flag).[4] In each of the foregoing cases, we explicitly found that suppressing communication was the object of the regulation of conduct. Where that has not been the case, however—where suppression of communicative use of the conduct was merely the incidental effect of forbidding the conduct for other reasons—we have allowed the regulation to stand. *O'Brien, supra,* at 377 (law banning destruction of draft card upheld in application against card burning to pro-

---

[4] It is easy to conclude that conduct has been forbidden because of its communicative attributes when the conduct in question is what the Court has called "inherently expressive," and what I would prefer to call "conventionally expressive"—such as flying a red flag. I mean by that phrase (as I assume the Court means by "inherently expressive") conduct that is normally engaged in for the purpose of communicating an idea, or perhaps an emotion, to someone else. I am not sure whether dancing fits that description, see *Dallas* v. *Stanglin*, 490 U. S. 19, 24 (1989) (social dance group "do[es] not involve the sort of expressive association that the First Amendment has been held to protect"). But even if it does, this law is directed against nudity, not dancing. Nudity is *not* normally engaged in for the purpose of communicating an idea or an emotion.

test war); *FTC* v. *Superior Court Trial Lawyers Assn.*, 493 U. S. 411 (1990) (Sherman Act upheld in application against restraint of trade to protest low pay); cf. *United States* v. *Albertini*, 472 U. S. 675, 687–688 (1985) (rule barring respondent from military base upheld in application against entrance on base to protest war); *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984) (rule barring sleeping in parks upheld in application against persons engaging in such conduct to dramatize plight of homeless). As we clearly expressed the point in *Johnson:*

> "The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word. It may not, however, proscribe particular conduct *because* it has expressive elements. What might be termed the more generalized guarantee of freedom of expression makes the communicative nature of conduct an inadequate *basis* for singling out that conduct for proscription." 491 U. S., at 406 (internal quotation marks and citations omitted; emphasis in original).

All our holdings (though admittedly not some of our discussion) support the conclusion that "the only First Amendment analysis applicable to laws that do not directly or indirectly impede speech is the threshold inquiry of whether the purpose of the law is to suppress communication. If not, that is the end of the matter so far as First Amendment guarantees are concerned; if so, the court then proceeds to determine whether there is substantial justification for the proscription." *Community for Creative Non-Violence* v. *Watt*, 227 U. S. App. D. C. 19, 55–56, 703 F. 2d 586, 622–623 (1983) (en banc) (Scalia, J., dissenting), (footnote omitted; emphasis omitted), rev'd *sub nom. Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984). Such a regime ensures that the government does not act to suppress communication, without requiring that all conduct-restricting regulation

(which means in effect all regulation) survive an enhanced level of scrutiny.

We have explicitly adopted such a regime in another First Amendment context: that of free exercise. In *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990), we held that general laws not specifically targeted at religious practices did not require heightened First Amendment scrutiny even though they diminished some people's ability to practice their religion. "The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.'" *Id.*, at 885, quoting *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 451 (1988); see also *Minersville School District* v. *Gobitis*, 310 U. S. 586, 594–595 (1940) (Frankfurter, J.) ("Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs"). There is even greater reason to apply this approach to the regulation of expressive conduct. Relatively few can plausibly assert that their illegal conduct is being engaged in for religious reasons; but almost anyone can violate almost any law as a means of expression. In the one case, as in the other, if the law is not directed against the protected value (religion or expression) the law must be obeyed.

### III

While I do not think the plurality's conclusions differ greatly from my own, I cannot entirely endorse its reasoning. The plurality purports to apply to this general law, insofar as it regulates this allegedly expressive conduct, an intermediate level of First Amendment scrutiny: The government interest in the regulation must be "'important or substantial,'". *ante*, at 567, quoting *O'Brien, supra,* at 377. As I have indi-

cated, I do not believe such a heightened standard exists. I think we should avoid wherever possible, moreover, a method of analysis that requires judicial assessment of the "importance" of government interests—and especially of government interests in various aspects of morality.

Neither of the cases that the plurality cites to support the "importance" of the State's interest here, see *ante*, at 569, is in point. *Paris Adult Theatre I* v. *Slaton*, 413 U. S., at 61, and *Bowers* v. *Hardwick*, 478 U. S., at 196, did uphold laws prohibiting private conduct based on concerns of decency and morality; but neither opinion held that those concerns were particularly "important" or "substantial," or amounted to anything more than a *rational basis* for regulation. *Slaton* involved an exhibition which, since it was obscene and at least to some extent public, was unprotected by the First Amendment, see *Roth* v. *United States*, 354 U. S. 476 (1957); the State's prohibition could therefore be invalidated only if it had no rational basis. We found that the State's "right . . . to maintain a decent society" provided a "legitimate" basis for regulation—even as to obscene material viewed by consenting adults. 413 U. S., at 59–60. In *Bowers*, we held that since homosexual behavior is not a fundamental right, a Georgia law prohibiting private homosexual intercourse needed only a rational basis in order to comply with the Due Process Clause. Moral opposition to homosexuality, we said, provided that rational basis. 478 U. S., at 196. I would uphold the Indiana statute on precisely the same ground: Moral opposition to nudity supplies a rational basis for its prohibition, and since the First Amendment has no application to this case no more than that is needed.

\*  \*  \*

Indiana may constitutionally enforce its prohibition of public nudity even against those who choose to use public nudity as a means of communication. The State is regulating conduct, not expression, and those who choose to employ con-

duct as a means of expression must make sure that the conduct they select is not generally forbidden. For these reasons, I agree that the judgment should be reversed.

JUSTICE SOUTER, concurring in the judgment.

Not all dancing is entitled to First Amendment protection as expressive activity. This Court has previously categorized ballroom dancing as beyond the Amendment's protection, *Dallas* v. *Stanglin*, 490 U. S. 19, 24–25 (1989), and dancing as aerobic exercise would likewise be outside the First Amendment's concern. But dancing as a performance directed to an actual or hypothetical audience gives expression at least to generalized emotion or feeling, and where the dancer is nude or nearly so the feeling expressed, in the absence of some contrary clue, is eroticism, carrying an endorsement of erotic experience. Such is the expressive content of the dances described in the record.

Although such performance dancing is inherently expressive, nudity *per se* is not. It is a condition, not an activity, and the voluntary assumption of that condition, without more, apparently expresses nothing beyond the view that the condition is somehow appropriate to the circumstances. But every voluntary act implies some such idea, and the implication is thus so common and minimal that calling all voluntary activity expressive would reduce the concept of expression to the point of the meaningless. A search for some expression beyond the minimal in the choice to go nude will often yield nothing: a person may choose nudity, for example, for maximum sunbathing. But when nudity is combined with expressive activity, its stimulative and attractive value certainly can enhance the force of expression, and a dancer's acts in going from clothed to nude, as in a striptease, are integrated into the dance and its expressive function. Thus I agree with the plurality and the dissent that an interest in freely engaging in the nude dancing at issue here is subject to a degree of First Amendment protection.

I also agree with the plurality that the appropriate analysis to determine the actual protection required by the First Amendment is the four-part enquiry described in *United States* v. *O'Brien*, 391 U. S. 367 (1968), for judging the limits of appropriate state action burdening expressive acts as distinct from pure speech or representation. I nonetheless write separately to rest my concurrence in the judgment, not on the possible sufficiency of society's moral views to justify the limitations at issue, but on the State's substantial interest in combating the secondary effects of adult entertainment establishments of the sort typified by respondents' establishments.

It is, of course, true that this justification has not been articulated by Indiana's Legislature or by its courts. As the plurality observes, "Indiana does not record legislative history, and the State's highest court has not shed additional light on the statute's purpose," *ante*, at 568. While it is certainly sound in such circumstances to infer general purposes "of protecting societal order and morality . . . from [the statute's] text and history," *ibid.*, I think that we need not so limit ourselves in identifying the justification for the legislation at issue here, and may legitimately consider petitioners' assertion that the statute is applied to nude dancing because such dancing "encourag[es] prostitution, increas[es] sexual assaults, and attract[s] other criminal activity." Brief for Petitioners 37.

This asserted justification for the statute may not be ignored merely because it is unclear to what extent this purpose motivated the Indiana Legislature in enacting the statute. Our appropriate focus is not an empirical enquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental interest in the service of which the challenged application of the statute may be constitutional. Cf. *McGowan* v. *Maryland*, 366 U. S. 420

(1961). At least as to the regulation of expressive conduct,[1] "[w]e decline to void [a statute] essentially on the ground that it is unwise legislation which [the legislature] had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it." *O'Brien, supra,* at 384. In my view, the interest asserted by petitioners in preventing prostitution, sexual assault, and other criminal activity, although presumably not a justification for all applications of the statute, is sufficient under *O'Brien* to justify the State's enforcement of the statute against the type of adult entertainment at issue here.

At the outset, it is clear that the prevention of such evils falls within the constitutional power of the State, which satisfies the first *O'Brien* criterion. See 391 U. S., at 377. The second *O'Brien* prong asks whether the regulation "furthers an important or substantial governmental interest." *Ibid.* The asserted state interest is plainly a substantial one; the only question is whether prohibiting nude dancing of the sort at issue here "furthers" that interest. I believe that our cases have addressed this question sufficiently to establish that it does.

In *Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41 (1986), we upheld a city's zoning ordinance designed to prevent the occurrence of harmful secondary effects, including the crime associated with adult entertainment, by protecting approximately 95% of the city's area from the placement of motion picture theaters emphasizing "'matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas" . . . for observation by patrons therein.'" *Id.,* at 44. Of particular importance to the present enquiry, we held that the city of Renton was not compelled to justify its restrictions by studies specifically relating to the problems

---

[1] Cf., *e. g., Edwards* v. *Aguillard,* 482 U. S. 578 (1987) (striking down state statute on Establishment Clause grounds due to impermissible legislative intent).

that would be caused by adult theaters in that city. Rather, "Renton was entitled to rely on the experiences of Seattle and other cities," *id.*, at 51, which demonstrated the harmful secondary effects correlated with the presence "of even one [adult] theater in a given neighborhood." *Id.*, at 50; cf. *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 71, n. 34 (1976) (legislative finding that "a concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime"); *California* v. *LaRue*, 409 U. S. 109, 111 (1972) (administrative findings of criminal activity associated with adult entertainment).

The type of entertainment respondents seek to provide is plainly of the same character as that at issue in *Renton, American Mini Theatres,* and *LaRue.* It therefore is no leap to say that live nude dancing of the sort at issue here is likely to produce the same pernicious secondary effects as the adult films displaying "specified anatomical areas" at issue in *Renton.* Other reported cases from the Circuit in which this litigation arose confirm the conclusion. See, *e. g., United States* v. *Marren*, 890 F. 2d 924, 926 (CA7 1989) (prostitution associated with nude dancing establishment); *United States* v. *Doerr*, 886 F. 2d 944, 949 (CA7 1989) (same). In light of *Renton*'s recognition that legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of those effects, the State of Indiana could reasonably conclude that forbidding nude entertainment of the type offered at the Kitty Kat Lounge and the Glen Theatre's "bookstore" furthers its interest in preventing prostitution, sexual assault, and associated crimes. Given our recognition that "society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate," *American Mini Theatres, supra,* at 70, I do not believe that a State is required affirmatively to undertake to litigate this issue repeatedly in every

case. The statute as applied to nudity of the sort at issue here therefore satisfies the second prong of *O'Brien.*[2]

The third *O'Brien* condition is that the governmental interest be "unrelated to the suppression of free expression," 391 U. S., at 377, and, on its face, the governmental interest in combating prostitution and other criminal activity is not at all inherently related to expression. The dissent contends, however, that Indiana seeks to regulate nude dancing as its means of combating such secondary effects "because . . . creating or emphasizing [the] thoughts and ideas [expressed by nude dancing] in the minds of the spectators may lead to increased prostitution," *post*, at 592, and that regulation of expressive conduct because of the fear that the expression will prove persuasive is inherently related to the suppression of free expression. *Ibid.*

The major premise of the dissent's reasoning may be correct, but its minor premise describing the causal theory of Indiana's regulatory justification is not. To say that pernicious secondary effects are associated with nude dancing establishments is not necessarily to say that such effects result from the persuasive effect of the expression inherent in nude dancing. It is to say, rather, only that the effects are correlated with the existence of establishments offering such dancing, without deciding what the precise causes of the correlation

---

[2] Because there is no overbreadth challenge before us, we are not called upon to decide whether the application of the statute would be valid in other contexts. It is enough, then, to say that the secondary effects rationale on which I rely here would be open to question if the State were to seek to enforce the statute by barring expressive nudity in classes of productions that could not readily be analogized to the adult films at issue in *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986). It is difficult to see, for example, how the enforcement of Indiana's statute against nudity in a production of "Hair" or "Equus" somewhere other than an "adult" theater would further the State's interest in avoiding harmful secondary effects, in the absence of evidence that expressive nudity outside the context of *Renton*-type adult entertainment was correlated with such secondary effects.

actually are. It is possible, for example, that the higher incidence of prostitution and sexual assault in the vicinity of adult entertainment locations results from the concentration of crowds of men predisposed to such activities, or from the simple viewing of nude bodies regardless of whether those bodies are engaged in expression or not. In neither case would the chain of causation run through the persuasive effect of the expressive component of nude dancing.

Because the State's interest in banning nude dancing results from a simple correlation of such dancing with other evils, rather than from a relationship between the other evils and the expressive component of the dancing, the interest is unrelated to the suppression of free expression. *Renton* is again persuasive in support of this conclusion. In *Renton*, we held that an ordinance that regulated adult theaters because the presence of such theaters was correlated with secondary effects that the local government had an interest in regulating was content neutral (a determination similar to the "unrelated to the suppression of free expression" determination here, see *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 298, and n. 8 (1984)) because it was "*justified* without reference to the content of the regulated speech." 475 U. S., at 48 (emphasis in original). We reached this conclusion without need to decide whether the cause of the correlation might have been the persuasive effect of the adult films that were being regulated. Similarly here, the "secondary effects" justification means that enforcement of the Indiana statute against nude dancing is "justified without reference to the content of the regulated [expression]," *ibid.* (emphasis omitted), which is sufficient, at least in the context of sexually explicit expression,[3] to satisfy the third prong of the *O'Brien* test.

---

[3] I reach this conclusion again mindful, as was the Court in *Renton,* that the protection of sexually explicit expression may be of lesser societal importance than the protection of other forms of expression. See *Renton,*

The fourth *O'Brien* condition, that the restriction be no greater than essential to further the governmental interest, requires little discussion. Pasties and a G-string moderate the expression to some degree, to be sure, but only to a degree. Dropping the final stitch is prohibited, but the limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message. Nor, so far as we are told, is the dancer or her employer limited by anything short of obscenity laws from expressing an erotic message by articulate speech or representational means; a pornographic movie featuring one of respondents, for example, was playing nearby without any interference from the authorities at the time these cases arose.

Accordingly, I find *O'Brien* satisfied and concur in the judgment.

JUSTICE WHITE, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

The first question presented to us in this case is whether nonobscene nude dancing performed as entertainment is expressive conduct protected by the First Amendment. The Court of Appeals held that it is, observing that our prior decisions permit no other conclusion. Not surprisingly, then, the plurality now concedes that "nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment . . . ." *Ante*, at 566. This is no more than recognizing, as the Seventh Circuit observed, that dancing is an ancient art form and "inherently embodies the expression and communication of ideas and emotions." *Miller* v. *Civil City of South Bend*, 904 F. 2d 1081, 1087 (1990) (en banc).[1]

*supra*, at 49, and n. 2, citing *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 70 (1976).

[1] JUSTICE SCALIA suggests that performance dancing is not inherently expressive activity, see *ante*, at 577, n. 4, but the Court of Appeals has the better view: "Dance has been defined as 'the art of moving the body in a rhythmical way, usually to music, to express an emotion or idea, to narrate

Having arrived at the conclusion that nude dancing performed as entertainment enjoys First Amendment protection, the plurality states that it must "determine the level of protection to be afforded to the expressive conduct at issue, and must determine whether the Indiana statute is an impermissible infringement of that protected activity." *Ante*, at 566. For guidance, the plurality turns to *United States* v. *O'Brien*, 391 U. S. 367 (1968), which held that expressive conduct could be narrowly regulated or forbidden in pursuit of an important or substantial governmental interest that is unrelated to the content of the expression. The plurality finds that the Indiana statute satisfies the *O'Brien* test in all respects.

The plurality acknowledges that it is impossible to discern the exact state interests which the Indiana Legislature had in mind when it enacted the Indiana statute, but the plurality nonetheless concludes that it is clear from the statute's text and history that the law's purpose is to protect "societal order and morality." *Ante*, at 568. The plurality goes on to

---

a story, or simply to take delight in the movement itself.' 16 The New Encyclopedia Britannica 935 (1989). Inherently, it is the communication of emotion or ideas. At the root of all '[t]he varied manifestations of dancing . . . lies the common impulse to resort to movement to externalise states which we cannot externalise by rational means. This is basic dance.' Martin, J. *Introduction to the Dance* (1939). Aristotle recognized in *Poetics* that the purpose of dance is 'to represent men's character as well as what they do and suffer.' The raw communicative power of dance was noted by the French poet Stéphane Mallarmé who declared that the dancer 'writing with her body . . . *suggests* things which the written work could *express* only in several paragraphs of dialogue or descriptive prose.'" 904 F. 2d, at 1085–1086. JUSTICE SCALIA cites *Dallas* v. *Stanglin*, 490 U. S. 19 (1989), but that decision dealt with social dancing, not performance dancing; and the submission in that case, which we rejected, was not that social dancing was an expressive activity but that plaintiff's *associational* rights were violated by restricting admission to dance halls on the basis of age. The Justice also asserts that even if dancing is inherently expressive, nudity is not. The statement may be true, but it tells us nothing about dancing in the nude.

conclude that Indiana's statute "was enacted as *a general prohibition*," *ante,* at 568 (emphasis added), on people appearing in the nude among strangers in public places. The plurality then points to cases in which we upheld legislation based on the State's police power, and ultimately concludes that the Indiana statute "furthers a substantial government interest in protecting order and morality." *Ante,* at 569. The plurality also holds that the basis for banning nude dancing is unrelated to free expression and that it is narrowly drawn to serve the State's interest.

The plurality's analysis is erroneous in several respects. Both the plurality and JUSTICE SCALIA in his opinion concurring in the judgment overlook a fundamental and critical aspect of our cases upholding the States' exercise of their police powers. None of the cases they rely upon, including *O'Brien* and *Bowers* v. *Hardwick,* 478 U. S. 186 (1986), involved anything less than truly *general* proscriptions on individual conduct. In *O'Brien,* for example, individuals were prohibited from destroying their draft cards at any time and in any place, even in completely private places such as the home. Likewise, in *Bowers,* the State prohibited sodomy, regardless of where the conduct might occur, including the home as was true in that case. The same is true of cases like *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990), which, though not applicable here because it did not involve any claim that the peyote users were engaged in expressive activity, recognized that the State's interest in preventing the use of illegal drugs extends even into the home. By contrast, in this case Indiana does not suggest that its statute applies to, or could be applied to, nudity wherever it occurs, including the home. We do not understand the plurality or JUSTICE SCALIA to be suggesting that Indiana could constitutionally enact such an intrusive prohibition, nor do we think such a suggestion would be tenable in light of our decision in *Stanley* v. *Georgia,* 394 U. S. 557 (1969), in which we held that States could not punish the

mere possession of obscenity in the privacy of one's own home.

We are told by the attorney general of Indiana that, in *State* v. *Baysinger*, 272 Ind. 236, 397 N. E. 2d 580 (1979), the Indiana Supreme Court held that the statute at issue here cannot and does not prohibit nudity as a part of some larger form of expression meriting protection when the communication of ideas is involved. Brief for Petitioners 25, 30–31; Reply Brief for Petitioners 9–11. Petitioners also state that the evils sought to be avoided by applying the statute in this case would not obtain in the case of theatrical productions, such as "Salome" or "Hair." *Id.*, at 11–12. Neither is there any evidence that the State has attempted to apply the statute to nudity in performances such as plays, ballets, or operas. "No arrests have ever been made for nudity as part of a play or ballet." App. 19 (affidavit of Sgt. Timothy Corbett).

Thus, the Indiana statute is not a *general* prohibition of the type we have upheld in prior cases. As a result, the plurality and JUSTICE SCALIA's simple references to the State's general interest in promoting societal order and morality are not sufficient justification for a statute which concededly reaches a significant amount of protected expressive activity. Instead, in applying the *O'Brien* test, we are obligated to carefully examine the reasons the State has chosen to regulate this expressive conduct in a less than general statute. In other words, when the State enacts a law which draws a line between expressive conduct which is regulated and nonexpressive conduct of the same type which is not regulated, *O'Brien* places the burden on the State to justify the distinctions it has made. Closer inquiry as to the purpose of the statute is surely appropriate.

Legislators do not just randomly select certain conduct for proscription; they have reasons for doing so and those reasons illuminate the purpose of the law that is passed. Indeed, a law may have multiple purposes. The purpose of

forbidding people to appear nude in parks, beaches, hot dog stands, and like public places is to protect others from offense. But that could not possibly be the purpose of preventing nude dancing in theaters and barrooms since the viewers are exclusively consenting adults who pay money to see these dances. The purpose of the proscription in these contexts is to protect the viewers from what the State believes is the harmful message that nude dancing communicates. This is why *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984), is of no help to the State: "In *Clark* . . . the damage to the parks was the same whether the sleepers were camping out for fun, were in fact homeless, or wished by sleeping in the park to make a symbolic statement on behalf of the homeless." 904 F. 2d, at 1103 (Posner, J., concurring). That cannot be said in this case: The perceived damage to the public interest caused by appearing nude on the streets or in the parks, as I have said, is not what the State seeks to avoid in preventing nude dancing in theaters and taverns. There the perceived harm is the communicative aspect of the erotic dance. As the State now tells us, and as JUSTICE SOUTER agrees, the State's goal in applying what it describes as its "content neutral" statute to the nude dancing in this case is "deterrence of prostitution, sexual assaults, criminal activity, degradation of women, and other activities which break down family structure." Reply Brief for Petitioners 11. The attainment of these goals, however, depends on preventing an expressive activity.

The plurality nevertheless holds that the third requirement of the *O'Brien* test, that the governmental interest be unrelated to the suppression of free expression, is satisfied because in applying the statute to nude dancing, the State is not "proscribing nudity because of the erotic message conveyed by the dancers." *Ante*, at 570. The plurality suggests that this is so because the State does not ban dancing that sends an erotic message; it is only nude erotic dancing that is forbidden. The perceived evil is not erotic dancing but pub-

lic nudity, which may be prohibited despite any incidental impact on expressive activity. This analysis is transparently erroneous.

In arriving at its conclusion, the plurality concedes that nude dancing conveys an erotic message and concedes that the message would be muted if the dancers wore pasties and G-strings. Indeed, the emotional or erotic impact of the dance is intensified by the nudity of the performers. As Judge Posner argued in his thoughtful concurring opinion in the Court of Appeals, the nudity of the dancer is an integral part of the emotions and thoughts that a nude dancing performance evokes. 904 F. 2d, at 1090–1098. The sight of a fully clothed, or even a partially clothed, dancer generally will have a far different impact on a spectator than that of a nude dancer, even if the same dance is performed. The nudity is itself an expressive component of the dance, not merely incidental "conduct." We have previously pointed out that "'[n]udity alone' does not place otherwise protected material outside the mantle of the First Amendment." *Schad* v. *Mt. Ephraim,* 452 U. S. 61, 66 (1981).

This being the case, it cannot be that the statutory prohibition is unrelated to expressive conduct. Since the State permits the dancers to perform if they wear pasties and G-strings but forbids nude dancing, it is precisely because of the distinctive, expressive content of the nude dancing performances at issue in this case that the State seeks to apply the statutory prohibition. It is only because nude dancing performances may generate emotions and feelings of eroticism and sensuality among the spectators that the State seeks to regulate such expressive activity, apparently on the assumption that creating or emphasizing such thoughts and ideas in the minds of the spectators may lead to increased prostitution and the degradation of women. But generating thoughts, ideas, and emotions is the essence of communication. The nudity element of nude dancing performances can-

not be neatly pigeonholed as mere "conduct" independent of any expressive component of the dance.[2]

That fact dictates the level of First Amendment protection to be accorded the performances at issue here. In *Texas* v. *Johnson,* 491 U. S. 397, 411–412 (1989), the Court observed: "Whether Johnson's treatment of the flag violated Texas law thus depended on the likely communicative impact of his expressive conduct. . . .We must therefore subject the State's asserted interest in preserving the special symbolic character of the flag to 'the most exacting scrutiny.' *Boos* v. *Barry,* 485 U. S. [312], 321 [(1988)]." Content based restrictions "will be upheld only if narrowly drawn to accomplish a compelling governmental interest." *United States* v. *Grace,* 461 U. S. 171, 177 (1983); *Sable Communications of Cal., Inc.* v. *FCC,* 492 U. S. 115, 126 (1989). Nothing could be clearer from our cases.

That the performances in the Kitty Kat Lounge may not be high art, to say the least, and may not appeal to the Court, is hardly an excuse for distorting and ignoring settled doctrine. The Court's assessment of the artistic merits of nude dancing performances should not be the determining factor in deciding this case. In the words of Justice Harlan: "[I]t is largely because governmental officials cannot make principled deci-

---

[2] JUSTICE SOUTER agrees with the plurality that the third requirement of the *O'Brien* test is satisfied, but only because he is not certain that there is a causal connection between the message conveyed by nude dancing and the evils which the State is seeking to prevent. See *ante,* at 585. JUSTICE SOUTER's analysis is at least as flawed as that of the plurality. If JUSTICE SOUTER is correct that there is no causal connection between the message conveyed by the nude dancing at issue here and the negative secondary effects that the State desires to regulate, the State does not have even a rational basis for its absolute prohibition on nude dancing that is admittedly expressive. Furthermore, if the real problem is the "concentration of crowds of men predisposed" to the designated evils, *ante,* at 586, then the First Amendment requires that the State address that problem in a fashion that does not include banning an entire category of expressive activity. See *Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41 (1986).

sions in this area that the Constitution leaves matters of taste and style so largely to the individual." *Cohen* v. *California*, 403 U. S. 15, 25 (1971). "[W]hile the entertainment afforded by a nude ballet at Lincoln Center to those who can pay the price may differ vastly in content (as viewed by judges) or in quality (as viewed by critics), it may not differ in substance from the dance viewed by the person who . . . wants some 'entertainment' with his beer or shot of rye." *Salem Inn, Inc.* v. *Frank*, 501 F. 2d 18, 21, n. 3 (CA2 1974), aff'd in part *sub nom. Doran* v. *Salem Inn, Inc.*, 422 U. S. 922 (1975).

The plurality and JUSTICE SOUTER do not go beyond saying that the state interests asserted here are important and substantial. But even if there were compelling interests, the Indiana statute is not narrowly drawn. If the State is genuinely concerned with prostitution and associated evils, as JUSTICE SOUTER seems to think, or the type of conduct that was occurring in *California* v. *LaRue*, 409 U. S. 109 (1972), it can adopt restrictions that do not interfere with the expressiveness of nonobscene nude dancing performances. For instance, the State could perhaps require that, while performing, nude performers remain at all times a certain minimum distance from spectators, that nude entertainment be limited to certain hours, or even that establishments providing such entertainment be dispersed throughout the city. Cf. *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986). Likewise, the State clearly has the authority to criminalize prostitution and obscene behavior. Banning an entire category of expressive activity, however, generally does not satisfy the narrow tailoring requirement of strict First Amendment scrutiny. See *Frisby* v. *Schultz*, 487 U. S. 474, 485 (1988). Furthermore, if nude dancing in barrooms, as compared with other establishments, is the most worrisome problem, the State could invoke its Twenty-first Amendment powers and impose appropriate regulation. *New York State Liquor Authority* v. *Bellanca*, 452 U. S. 714 (1981) *(per curiam); California* v. *LaRue, supra.*

As I see it, our cases require us to affirm absent a compelling state interest supporting the statute. Neither the plurality nor the State suggest that the statute could withstand scrutiny under that standard.

JUSTICE SCALIA's views are similar to those of the plurality and suffer from the same defects. The Justice asserts that a general law barring specified conduct does not implicate the First Amendment unless the purpose of the law is to suppress the expressive quality of the forbidden conduct, and that, absent such purpose, First Amendment protections are not triggered simply because the incidental effect of the law is to proscribe conduct that is unquestionably expressive. Cf. *Community for Creative Non-Violence* v. *Watt*, 227 U. S. App. D. C. 19, 703 F. 2d 586, 622–623 (1983) (Scalia, J., dissenting). The application of the Justice's proposition to this case is simple to state: The statute at issue is a general law banning nude appearances in public places, including barrooms and theaters. There is no showing that the purpose of this general law was to regulate expressive conduct; hence, the First Amendment is irrelevant and nude dancing in theaters and barrooms may be forbidden, irrespective of the expressiveness of the dancing.

As I have pointed out, however, the premise for the Justice's position—that the statute is a *general* law of the type our cases contemplate—is nonexistent in this case. Reference to JUSTICE SCALIA's own hypothetical makes this clear. We agree with JUSTICE SCALIA that the Indiana statute would not permit 60,000 consenting Hoosiers to expose themselves to each other in the Hoosier Dome. No one can doubt, however, that those same 60,000 Hoosiers would be perfectly free to drive to their respective homes all across Indiana and, once there, to parade around, cavort, and revel in the nude for hours in front of relatives and friends. It is difficult to see why the State's interest in morality is any less in that situation, especially if, as JUSTICE SCALIA seems to suggest, nudity is inherently evil, but clearly the statute does

not reach such activity. As we pointed out earlier, the State's failure to enact a truly general proscription requires closer scrutiny of the reasons for the distinctions the State has drawn. See *supra*, at 590.

As explained previously, the purpose of applying the law to the nude dancing performances in respondents' establishments is to prevent their customers from being exposed to the distinctive communicative aspects of nude dancing. That being the case, JUSTICE SCALIA's observation is fully applicable here: "Where the government prohibits conduct *precisely because of its communicative attributes*, we hold the regulation unconstitutional." *Ante*, at 577.

The *O'Brien* decision does not help JUSTICE SCALIA. Indeed, his position, like the plurality's, would eviscerate the *O'Brien* test. *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U. S. 872 (1990), is likewise not on point. The Indiana law, as applied to nude dancing, targets the expressive activity itself; in Indiana nudity in a dancing performance is a crime because of the message such dancing communicates. In *Smith*, the use of drugs was not criminal because the use was part of or occurred within the course of an otherwise protected religious ceremony, but because a general law made it so and was supported by the same interests in the religious context as in others.

Accordingly, I would affirm the judgment of the Court of Appeals, and dissent from this Court's judgment.