TRIPLETT GRILLE, INC., dba
The Back Door, Plaintiff,

v.

CITY OF AKRON, Defendant.

No. 5:92CV2488.

United States District Court,
N.D. Ohio, E.D.

March 17, 1993.

J. Michael Murray, Steven D. Shafron, Berkman, Gordon, Murray & Palda, Cleveland, OH, for plaintiff.

Deborah Forfia, David A. Muntean, Asst. Director of Law, the City of Akron, Akron, OH, for defendant.

## ORDER

SAM H. BELL, District Judge.

Currently pending before the court is plaintiff's motion for a permanent injunction.

The motion was filed on November 23, 1992. A hearing was held for purposes of deciding whether a temporary restraining order was justified. The court ruled on December 1, 1992, that a temporary injunction was not warranted. Subsequently, the court received argument and evidence from the parties at two other hearings.

## BACKGROUND

The cause presented for this court's resolution is one which examines the tension which frequently exists between expressions of moral standards enunciated by members of a given community and provisions of the First Amendment to the Constitution of the United States—provisions which govern all members of all communities throughout this nation.

Several questions must be discussed during the course of this opinion. The answer to each of these is to be found by analyzing all of the facts and circumstances in evidence before this court and by applying the law to those facts. This is said because on its surface, this case presents a single and simplistic inquiry: can not the people of a city, acting through their elected agents, the council members of that city, establish laws which protect what are believed to be defined principles of moral conduct? The answer to that inquiry must be an affirmative one provided that the legislation enacted does not abrogate the rights of others whose views are recognized as being protected by that law which is superior to all others in this nation: the Constitution of the United States.

A central subject of our discussion here is nude dancing in a bar within the confines of the City of Akron. One's first impression could well be that such an activity might readily be barred for any number of reasons. Some of these reasons were advanced by the legislators who enacted the ordinance under discussion; others were voiced by various community groups which urged the ban placed into effect with the passage of the City ordinance. However this may be, this court must begin any analysis of the issues in this cause by recognizing that the law in these United States affords nude dancing constitutional protection under the wing of

the First Amendment. It must be understood then that any view taken by this court in relation to this cause is predicated upon a long line of precedent guaranteeing legal sanctuary to the activity to which objection was made and which eventually became encompassed within the parameters of the ordinance under discussion.

Plaintiff in this cause is Triplett Grille, Inc., an Ohio corporation which operates an alcohol-serving bar called "Chasers Too" at 1955 Triplett Boulevard in Akron. Plaintiff also operates a non-alcohol serving "juice bar" in the same building. The latter establishment is called "The Back Door". Defendant City of Akron is a charter municipality under Ohio state law.

In November 1991 when plaintiff corporation was formed, the building at 1955 Triplett Boulevard contained only one establishment, Chasers Too. In September 1992, plaintiff decided to offer a different form of entertainment—live nude performance dancing. To effect this end, plaintiff substantially renovated the interior of the building to separate the alcohol-serving Chasers Too side from the juice-serving nude dancing side, The Back Door.[1]

At the time plaintiff anticipated commencing operations at The Back Door, Akron had a public indecency statute which provided in pertinent part:

(A) No person shall recklessly do any of the following, under circumstances in which his or her conduct is likely to be viewed by and affront others, not members of his or her household:

(1) Expose his or her private parts, or engage in masturbation;

(2) Engage in sexual conduct;

(3) Engage in conduct which to an ordinary observer would appear to be sexual conduct or masturbation.

Akron City Code § 133.06. Plaintiff isolated The Back Door's dancers from casual observers to assure that the dancing was unlikely to be viewed by observers who would be affronted, therefore, the proposed entertainment would not have violated section 133.06.

On October 12, 1992, at 4:00 p.m., The Back Door opened and commenced presenting performance dancing that included nudity. The inaugural performance lasted little more than an hour before the Akron police department vice squad, accompanied by Council member John Otterman, stepped in to shut down the bar pursuant to A.C.C. § 111.579, which provides in part:

The Police Chief or the Fire Chief, or their designated officers, shall without written notice cause the immediate cessation of any activity described in § 111.570 which is being conducted without benefit of a city license as required in § 111.570 for the reason of improper and illegal operation.

Section 111.570 defines the broad scope of Akron's theatrical licensing system:

No person, firm, corporation, or partnership shall act, exhibit, play, or perform any farce, play, drama, comedy, opera, or other theatrical performance, circus, feats of horsemanship, menagerie, exhibition of animals, amusement house, haunted house, fun house, panorama, diorama, concert, or other exhibition, entertainment, show, moving picture show, or amusement of whatever name or nature for which money or other reward is in any manner demanded or received, without first obtaining a license therefor issued by the Mayor.

Plaintiff had not secured a theatrical license for The Back Door.

In the week following the raid, while plaintiff endeavored to secure the necessary license, Akron City Council reacted to public appeals to permanently shut down The Back Door. Council member Otterman, representing a ward adjacent to The Back Door, proposed a new public indecency ordinance. In doing so, Mr. Otterman acted with a considerable degree of care. He contacted the city law department and apparently was advised that nude dancing as such enjoyed the protection of the First Amendment and could

---

1. Such a separation is apparently required by Ohio liquor control regulations. While there was some testimony regarding the status of plaintiff's liquor license, it is ultimately irrelevant to this court's consideration. Plaintiff testified that if its dispute with the Ohio Liquor Control Board is not favorably resolved, it would surrender its liquor license rather than be prohibited from offering live nude performance dancing.

not be legislated into oblivion. Thus, the ordinance proposed did not center on the protected activity but upon public nudity which, of course, included nude dancing displays. Council approved the new ordinance and ultimately repealed the previously quoted section of the public indecency statute replacing it with the following provisions:

(A) No person shall knowingly or intentionally, in a public place:

(1) Engage in sexual intercourse;

(2) Engage in deviant sexual conduct;

(3) Appear in a state of nudity; or

(4) Fondle the genitals of himself or another person;

(B) For the purposes of this section only, the following definitions shall apply:

"*Nudity*" means the showing of the human male or female genitals or pubic area with less than a fully opaque covering, the showing of the female breast with less than a fully opaque covering of any part of the nipple, or the showing of the covered male genitals in a discernibly turgid state.

"*Public Place*" means any street, sidewalk, right of way, and any public or private building or place where the general public is invited.

A.C.C. § 133.06(A)–(B). This change was adopted as an emergency measure so that it took effect immediately after the Mayor signed it on October 21, 1992. As stated above, the new public indecency statute very clearly includes within its broad prohibition the nude performance dancing which The Back Door sought to exhibit.

Every member of Akron's City Council testified at one of two hearings before this court about the enactment of this legislation. The Council members stated that they enacted the law because vocal constituents in Council member Otterman's ward and else-where stated that they were opposed to the nude dancing.[2] The Council members did uniformly testify that they intended the law to eliminate all public nudity in Akron. When pressed to explain what public nudity the new law proscribed that was not proscribed by the old law, most of the Council members could only point to theatrical productions which included nudity, and performance dancing. One Council member testified that art classes at the University of Akron are now proscribed from using live nude models.[3]

The Council members were also unable to specify any nudity-related problems other than the public outcry directly related to The Back Door. No Council member testified to any concern about the kind of entertainment offered by The Back Door, except to the extent that The Back Door morally outraged a vocal constituency. One Council member agreed that his support of this legislation was in part based on his expectation that Council member Otterman would provide similar assistance should a situation like this arise in his ward. None of the law makers testified to considering any evidence or studies whether related to Akron or another city which addressed the impact of nude entertainment in general or nude "adult" entertainment in particular, on crime or other related social problems.

Summing up the City's intent, the Mayor, who by law had to sign the ordinance for it to go into effect, testified that, in his opinion Council was establishing "a community standard of sorts" by way of the new ordinance. In the Mayor's words, "[T]here was a need there and I [signed the ordinance] and decided that it was a community standard being established."

---

2. The City submitted petitions from approximately 11 area churches appearing to bear over 1500 signatures. The petitions read:

> We the undersigned believe that public nude activity is a detriment to the moral well being of our community. We urge the City Council to take what ever steps are necessary to prohibit such activity in our community. In so doing we also urge the City Council to prohibit the activity of establishments like *Chaser's Too*. We expect and demand that the members of City Council take leadership in guarding what

moral stand our community has been able to maintain over the years.
Exhibit J (emphasis supplied).

3. Counsel for the City rebutted this interpretation in argument, claiming the City would not apply the law to Akron University art classes because the University classes are not a public place according to the definition in the ordinance. This distinction is predicated on the fact that University classes are only open to individuals who have paid tuition rather than to the public at large.

Plaintiff challenges the constitutionality of Akron's new public indecency statute and Akron's theater licensing scheme. While arising in the same factual context, these challenges are legally distinct and shall be considered separately.

## LAW AND ANALYSIS

Plaintiff questions the validity of Akron's new ordinance on two separate but parallel grounds. Plaintiff says that the ordinance as applied to the nude dancing activity abridges plaintiff's right to freedom of expression under the First Amendment to the Constitution. Plaintiff also contends that the ordinance should be struck down because it is unconstitutionally overbroad.

### I.

■ Defendant opposes plaintiff's view; in so doing the City relies on the authority of a recent opinion of the United States Supreme Court: *Barnes v. Glen Theatre, Inc.,* —— U.S. ——, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). The wording of the new Akron ordinance is nearly identical to the Indiana statute declared to be constitutionally valid in *Barnes.* The only difference in substance between the Akron ordinance and the Indiana statute is the inclusion in the ordinance of a definition of the term "public place". In Indiana such a definition was ultimately supplied by the Indiana Supreme Court. *Indiana v. Baysinger,* 272 Ind. 236, 397 N.E.2d 580, 583 (1979) (defining "public place" to mean "any place where the public is invited and are free to go upon special or implied invitation—a place available to all or a certain segment of the public"), *appeals dism'd sub nom. Clark v. Indiana,* 446 U.S. 931, 100 S.Ct. 2146, 64 L.Ed.2d 783 and *Dove v. Indiana,* 449 U.S. 806, 101 S.Ct. 52, 66 L.Ed.2d 10 (1980). The conduct at issue in this case and *Barnes,* live nude performance dancing expressing an explicit erotic message, is also comparable. Because it is obvious that defendant City's legislation is patterned on legislation approved by precedential opinion, we attach considerable attention to that opinion.

While the Supreme Court did directly address the constitutionality of the Indiana ordinance, the application of *Barnes* to the instant facts is difficult. The first problem is posed by the splintered nature of the opinion itself. In reality the *Barnes* opinion is four opinions. Chief Justice Rehnquist joined by Justices O'Connor and Kennedy authored the plurality view while Justices Scalia and Souter concurred separately but each on differing bases. Justice White joined by Justices Marshall, Blackmun and Stevens voiced the dissenting opinion. *Barnes,* then, is a true plurality (as opposed to a majority) opinion. The *rationes decidendi* of the plurality and concurring opinions cannot be seen as being the same. *See,* Mark Alan Thurmon, Note, *When the Court Divides: Reconsidering the Precedential Value of Supreme Court Plurality Decisions,* 42 Duke L.J. 419, 419 n. 1 (1992) (distinguishing true plurality decisions from 'false' or 'dual majority' decisions). This being so, we must first delineate the boundaries of the precedent given us by *Barnes,* which in turn govern our decision in this particular case.

Among the early justices of the Supreme Court, the difficulty of interpreting fractured opinions was readily apparent.

> The practice of this court is not (except in cases of absolute necessity) to deliver any judgment in cases where constitutional questions are involved, unless four judges concur in opinion, thus making the decision that of a majority of the whole court.

*New York v. Miln,* 33 U.S. (8 Pet.) 122, 8 L.Ed. 888, 888 (1834) (Marshall, J.) (written when the Supreme Court consisted of only seven justices). As divisions among the justices became more prevalent and intractable, this practice fell by the wayside. In its place, the Supreme Court provided instructions for lower courts interpreting plurality decisions. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976)). This so-called 'narrowest grounds' test is itself problematic, especially when the narrow-

est ground appears to reverse a prior majority-supported precedent. Between the two, it seems, the majority decision must retain superior precedential authority. Our inquiry, therefore, focuses on the opinions of the plurality, Justice Scalia and Justice Souter.

The plurality began by establishing the constitutional context for the case. The plurality view, joined by Justice Souter and all dissenting members of the Court, agreed with the Court of Appeals "that nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it marginally so." *Barnes*, —— U.S. at ——, 111 S.Ct. at 2460, 115 L.Ed.2d at 511 (Rehnquist, C.J.). To determine the level of protection appropriate to this expressive conduct only marginally within the perimeter of the First Amendment, the plurality applied the four-part inquiry described in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

[A] government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial government interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

The plurality found the first and last prongs relatively uncontroversial. The second prong is clearly the focus of the test since the remaining elements all refer to the government's interest. Failure to satisfy *any* of the elements invalidates the regulation. According to the plurality, the second prong was satisfied by Indiana's "purpose of protecting societal order and morality." *Barnes*, —— U.S. at ——, 111 S.Ct. at 2461, 115 L.Ed.2d at 512. The third prong was satisfied because the Indiana ordinance was deemed to be a general statute banning all public nudity rather than a specific statute banning nude dancing. *Id.* at ——, 111 S.Ct. at 2462, 115 L.Ed.2d at 514.

Justice Souter agreed with the plurality that nude dancing is within the scope of the First Amendment. "[W]hen nudity is combined with expressive activity, its stimulative and attractive value certainly can enhance the force of expression, and a dancer's acts in going from clothed to nude, as in a striptease, are integrated into the dance and its expressive function." *Id.* —— U.S. at ——, 111 S.Ct. at 2468, 115 L.Ed.2d at 521. Justice Souter further agreed that the test from *O'Brien* should apply; he did, however, reject the plurality's analysis of the second and third prongs of the *O'Brien* inquiry. "I nonetheless write separately to rest my concurrence in the judgment, *not on the possible sufficiency of society's moral views to justify the limitations at issue,* but on the State's substantial interest in combating the secondary effects of adult entertainment establishments of the sort typified by respondents' establishments." *Id.* at ——, 111 S.Ct. at 2468–69, 115 L.Ed.2d at 521 (emphasis added).

Combatting the secondary effects of adult entertainment has been accepted as a proper governmental interest in zoning cases before the Supreme Court. *See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (holding that the city could rely on the experiences of other comparable cities in concluding that adult entertainment establishments contribute to deleterious secondary effects); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (upholding zoning regulation based on legislative finding that "a concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime"). Justice Souter's opinion extends the secondary effects analysis of *Renton* to nonzoning contexts. Interestingly, he adopted this argument despite the fact that neither the State of Indiana nor the City of South Bend articulated any concern about secondary effects. *Barnes*, —— U.S. at ——, 111 S.Ct. at 2469, 115 L.Ed.2d at 521–522.

Justice Scalia rejected the First Amendment analysis applied by the other members of the Court because he felt that the statute was "a general law regulating conduct and not specifically directed at expression, it is not subject to First Amendment scrutiny at all." *Id.* at ——, 111 S.Ct. at 2462, 115 L.Ed.2d at 515. Under Justice Scalia's approach, the law need only satisfy the ration-

al-basis review required by the Due Process Clause.

Applying the *Marks* test to these three opinions, Justice Souter appears to rule on the narrowest grounds. Justice Scalia very broadly denies all First Amendment protection to nude dancing. The plurality dramatically expands the scope of the *O'Brien* test by allowing morality concerns to justify local legislation. Justice Souter, in contrast, bases his application of the *O'Brien* test on assumptions previously upheld in *Renton.* This conclusion is in accord with another Circuit called upon to interpret the fractured *Barnes rationes decidendi.*

> Justice Souter, whose vote was necessary to uphold the statute, stated that morality justifications were not a substantial government interest, but that control of secondary effects did constitute such an interest. Thus, in order to uphold a statute regulating nude dancing, it is still necessary after *Barnes* that the statute meet the secondary effects test of *Renton.*

*Int'l Eateries of America, Inc. v. Broward Cty.,* 941 F.2d 1157, 1161 (11th Cir.1991) (addressing the impact of *Barnes* on a challenge to a zoning ordinance asserted to constructively ban nude dancing), *cert. denied,* — U.S. —, 112 S.Ct. 1294, 117 L.Ed.2d 517 (1992).[4]

It is clear that the instant legislation can not satisfy the secondary effects test. As weak as the *Renton* test is, Akron does not meet it.

> The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, *so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.*

*Renton,* 475 U.S. 41, 51–52, 106 S.Ct. 925, 931. Initially, the court notes that none of the Council members testified to any judicially cognizable secondary effects. Only one of the Council members touches on this subject in his testimony. It seems quite clear that each of the Council members was interested in assisting Mr. Otterman to respond to the complaints offered by members of the electorate. Needless to say, political response is not a constitutionally significant secondary effect. On the evidence before this court, it is clear that Akron's ordinance was not designed to combat any secondary effects and that the Akron City Council did not consider any evidence of secondary effects in their deliberation on this ordinance. According to the teaching of *Renton* then, Akron's ordinance is constitutionally infirm.

As heretofore noted, in *Barnes,* Justice Souter injected the secondary effects motive even though, as here, no prior testimony concerning that issue was offered by the State of Indiana or the City of South Bend. But for this court to introduce such a phantom motive in the instant action is inappropriate. On the occasion that Justice Souter did *sua sponte* inject a secondary effects analysis, the Court was considering a law passed by a sizable state legislature. In that context, it is practically difficult to consider the information relied upon by every individual who supported the act. Also, no legislative materials, like committee reports, are published by the Indiana state legislature. In short, Justice Souter had no factual record upon which to conclude positively or negatively whether secondary effects were considered, and he had every reason to believe that at least some of the legislators may have considered that issue.

In contrast, every Akron law maker testified concerning Council's deliberation before enacting the new public indecency law. There are no anonymous law makers to whom the court can attribute a secondary

---

**4.** It is curious to note that *Barnes* appears to have had little practical effect on the regulation of adult entertainment or nudity. Of the handful of cases which even cite *Barnes,* only one actually involves a ban on nudity, and in that case, the community argued in favor of its ordinance based on the 21st Amendment. *Vonderhaar v. Parish of St. Tammany,* 784 F.Supp. 1239, 1244 (E.D.La.1992) (declining to grant a preliminary injunction due to an inadequate factual record upon which to compare the case to *Barnes,* but cautioning the parties "that many of the cases dealing with this issue arise in the context of zoning regulations"). *See also D.G. Restaurant Corp. v. Myrtle Beach,* 953 F.2d 140 (4th Cir. 1992) (citing *Barnes* in a case upholding zoning regulation of adult entertainment). There is no question that zoning is the legislatively preferred and judicially accepted method of regulating adult entertainment.

effects concern. The court knows of no authority by which it may add to witness testimony by judicial fiat, even when such addition is in the witness's interest.

█ At this juncture, it is appropriate to comment on the City's standing objection to the use of the testimony of the Council members. Defendant correctly argues that the Supreme Court has frequently refused to inquire into the motive of state and local legislatures. For example, in *O'Brien*, the Court warned:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the court will look for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well established criteria, constitutional on its face, on the basis of what fewer than a handful of legislators said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

*O'Brien*, 391 U.S. at 383–84, 88 S.Ct. at 1683. *See also Arlington Heights v. Metropolitan Housing Development*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Palmer v. Thompson*, 403 U.S. 217, 224, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438, 444 (1971).

This court does not use the testimony of Akron's municipal law makers to determine their motive or the purpose of the public indecency ordinance. While the City is correct in pointing out that using the testimony to make a determination of subjective elements like motive and purpose is suspect, the City is incorrect to the extent that it argues that the testimony of the law makers has no useful purpose at all. To the contrary, the previously quoted portion of *Renton* supports plaintiff's use of the law makers' testimony—the objective determination of what evidence was before Council when the public indecency ordinance was adopted. Such an inquiry does not invade the discretionary function of the legislature. Moreover, this inquiry is explicitly ratified by the Supreme Court.

Therefore, defendant's objection remains overruled and the testimony is considered for purposes of defining Council's secondary effects deliberations.

Even if the court were authorized to add to the testimony considerations not otherwise in evidence, injection of secondary effects concerns is improper given the broad scope of the Akron ordinance.

### II.

Plaintiff's challenge of the statute as applied necessarily implicates only adult entertainment—a context in which secondary effects may properly be considered. On its face, however, the Akron ordinance applies to a much wider range of conduct, including other expressive conduct. This court is not presently concerned that the Akron ordinance apparently criminalizes high school locker rooms and public rest rooms while failing to proscribe offensive nude conduct which does not occur in a "public place" as defined by statute. But this court does have an obligation to protect the constitutional freedom of expression. That obligation obviously includes preventing the City from closing opportunities for artistically, socially and politically valuable expression which include nudity in their presentation.

Akron's ordinance is a broad prohibition which applies to all performances which include nudity of any kind, not just erotic adult entertainment. While a court may perhaps choose, on the authority of Justice Souter's opinion, to inject secondary effects in the context of adult entertainment, doing so in the broader expressive context in which the Akron ordinance functions oversteps proper judicial bounds and reason.

The City argues that consideration of the broad reach of its ordinance is inappropriate. The instant case is before this court in a context significantly different than *Barnes*. The Indiana statute was originally challenged in federal court on the basis of facial overbreadth. That challenge was dismissed by the Seventh Circuit and the case was remanded for consideration of the law as applied. Significant to our view here, it is noted that the Seventh Circuit dismissed the

facial overbreadth challenge by virtue of a limitation on the act imposed in *Baysinger:*

> There is no right to appear nude in public. Rather, it may be constitutionally required to tolerate or to allow some nudity as a part of some larger form of expression meriting protection, when the communication of ideas is involved.

397 N.E.2d at 587.[5] On remand, the statute, as applied, was struck down by the District Court. *Glen Theatre, Inc. v. Civil City of South Bend,* 695 F.Supp. 414 (N.D.Ind.1988). The Seventh Circuit ultimately agreed with the District Court. *Miller v. Civil City of South Bend,* 904 F.2d 1081 (7th Cir.1990) (en banc). The Supreme Court granted certiorari to hear the appeal of the challenge to the Indiana law as applied. 498 U.S. 807, 111 S.Ct. 38, 112 L.Ed.2d 15 (1990). The issue of overbreadth was not before the Supreme Court. At no place in *Barnes* does the Court consider the constitutionality of applying the Indiana ordinance to any expressive conduct other than nude, erotic, barroom-type dancing.

The City contends that application of the overbreadth doctrine is inappropriate because the court does not have a fully developed set of facts upon which to base a decision. In making this argument, the City significantly misapprehends the purpose and application of the overbreadth doctrine. Contrary to the City, the court finds that in the instant cause it is appropriate.

In an early case considering the propriety of banning "the customary 'barroom' type of nude dancing,' " the Supreme Court did endorse overbreadth analysis.

> We have previously held that even though a statute or ordinance may be constitutionally applied to the activities of a particular defendant, that defendant may challenge it on the basis of overbreadth if it is so drawn as to sweep within its ambit protected speech or expression of other persons not before the Court. As we said in *Grayned v. City of Rockford,* 408 U.S. 104,

114 [92 S.Ct. 2294, 2302, 33 L.Ed.2d 222] (1972):

> Because overbroad laws, like vague ones, deter privileged activity, our cases firmly establish appellant's standing to raise an overbreadth challenge.

*Doran v. Salem Inn, Inc.,* 422 U.S. 922, 933, 95 S.Ct. 2561, 2568–69, 45 L.Ed.2d 648 (1975) (Rehnquist, J.) (upholding alcohol-serving bar owner's challenge to anti-nude dancing law on behalf of establishments which do not serve liquor who were not otherwise before the Court). Given the fact that the Supreme Court permitted a bar owner against whom, by virtue of the 21st Amendment, the anti-nudity law was clearly proper to argue on behalf of other exhibitors of adult entertainment, it is difficult to perceive a basis for challenging a bar owner's advocacy on behalf of exhibitors of artistic and socially valuable entertainment.

The City relies on *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), which cautions:

> The scope of the First Amendment overbreadth doctrine, like most exceptions to established principles, must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted. Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is "strong medicine" and have employed it with hesitation, and then only as a last resort." *Broadrick [v. Oklahoma],* 413 U.S. [601,] 613 [93 S.Ct. 2908, 2916, 37 L.Ed.2d 830] [ (1973) ]. We have, in consequence, insisted that the overbreadth involved be "substantial" before the statute involved will be invalidated on its face.

458 U.S. at 769, 102 S.Ct. at 3361. While *Ferber* itself postdates *Doran,* the opinion to which *Ferber* refers and which also enunciated the notion of substantial overbreadth pre-

---

5. In a subsequent opinion, Indiana upheld the conviction of a woman who danced topless in the "Miss Erotica of Fort Wayne" contest. *Erhardt v. Indiana,* 468 N.E.2d 224 (Ind.1984). In *Erhardt,* the Indiana Supreme Court correctly predicted that the constitution does not require tolerance of nudity in erotic adult entertainment, a

view consistent with the plurality's placement of nude barroom dancing only *marginally* within the *perimeter* of the First Amendment. *Erhardt* does not overrule the reasoning in *Baysinger* and should not be read to have any import outside the limited context of adult entertainment.

dates *Doran.* Thus, it is logical to conclude that since the instant case is analogous to *Doran* and substantial overbreadth existed in *Doran,* substantial overbreadth also exists in the instant case.

The broad range of expressive conduct which is potentially prohibited by Akron's ordinance has not been shown to be harmful. The conduct involved surely does not lack constitutional protection. Inasmuch as adult entertainment such as nude dancing is afforded some degree of constitutional protection, it stands to reason that other types of artistic expression reached by the breadth of Akron's law will be afforded even greater First Amendment protection.[6] The impact of Akron's law goes significantly beyond its only legitimate sweep, combatting the secondary effects of adult entertainment. Finally, it is highly improbable that any itinerant dance or theatrical company seeking to perform an artistic or cultural exhibition which included nudity would undertake the costly and time-consuming burden of federal litigation necessary to perform in Akron. For all of these reasons, Akron's ordinance is found to be substantially overbroad and plaintiff must be permitted to challenge the statute on behalf of others as well as on their own behalf. To hold otherwise will allow the City to chill valuable First Amendment speech.[7]

The court is unaware of any judicial decision or academic study positing a link between crime and other cognizable secondary effects and theatrical and artistic performances, which include nudity, as distinguished from adult entertainment, featuring that same element. Justice Souter in *Barnes* limited his opinion to consideration of combating the secondary effects of "adult entertainment." Likewise, in *Renton,* the opinion was limited to consideration of adult enter-

tainment. Lacking any evidence to support a causal connection between secondary effects and artistic exhibitions which include nudity, it is impossible for the court to take judicial notice of such an assertion. Therefore, the Akron ordinance can not be deemed to satisfy even the phantom secondary effects analysis necessary under *Barnes.*

It is axiomatic that City Council has the right and obligation to consider and protect the moral well-being of their community. That power is, however, circumscribed under our constitutional system. For example, under traditional obscenity analysis the manner in which sexually-oriented expression is proscribed is through analysis under the test articulated in *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973):

> The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

Part (a) of the test applies local moral standards. Part (c), however, limits the applicability of local standards so that a work of special societal merit could not be banned. *Pope v. Illinois,* 481 U.S. 497, 501, 107 S.Ct. 1918, 1921, 95 L.Ed.2d 439 (1987).

In the Supreme Court's most recent decision regarding conduct protected under the First Amendment, the Court reaffirmed the

---

**6.** Implicit in the plurality's characterization of nude adult entertainment as *marginally* within the *perimeters* of the First Amendment is the notion that there is a hierarchy of First Amendment expression. The result in *Barnes* endorses the conclusion that in that hierarchy, adult entertainment is very low. In contrast, other nude dancing which includes the kind of artistic quality or social or political message anticipated by the third part of the *Miller* obscenity test is presumably of higher First Amendment value and not "marginally" within the "perimeter".

**7.** The adult entertainment exhibited at The Back Door is only one form of expression which includes nudity or conduct proscribed by the Akron ordinance. As an instance, Alwin Nikolais, 1987 winner of Kennedy Center Honors and the National Medal of the Arts, includes some nudity in his dances, including his 1985 dance "Crucible", about evolution. Other choreographers also use nudity in dance in a non-erotic manner. For example, David Rousseve includes a nude scene in his dance "Urban Scenes/Creole Dreams", a dance telling the story of his Creole grandmother and of his own experiences as a black child bused to a white school in Houston.

broad principles of construction applied in our discussions here.

> [O]ur society like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

*R.A.V. v. St. Paul,* ___ U.S. ___, ___ 112 S.Ct. 2538, 2542–43, 120 L.Ed.2d 305, 317 (1992) (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942)). Indeed, the areas in which state regulation is permitted are few and limited. To extend those regulable areas to include expressive conduct not previously subject to regulation and otherwise possessing discernible social value on the strength of the fractured decision in *Barnes* would be improper. Not only would such an interpretation extend *Barnes* beyond the scope of the issues before the Supreme Court, it would also have the affect of altering the settled First Amendment landscape based on a rationale which no majority of the Court has ever supported.

It seems anomalous to this court to force local communities, under the *Miller* test, to accept films and books which may offend contemporary community standards because they are of serious literary, artistic or political value while affording the community the power to ban live performances with serious value which offend the community standard. The position advanced by the City is analogous to the position adopted in dissent by Chief Justice Burger and then-Justice Rehnquist in *Schad v. Mt. Ephraim,* 452 U.S. 61, 87, 101 S.Ct. 2176, 2192, 68 L.Ed.2d 671 (1981):

> The towns and villages of this Nation are not, and should not be, forced into a mold cast by this Court. Citizens should be free to choose to shape their community so that it embodies their conception of the "decent life." This will sometimes mean deciding that certain forms of activity—factories, gas stations, sports stadia, bookstores, and surely live nude shows—will not be allowed. That a community is willing to tolerate such a commercial use as a convenience store, a gas station, a pharmacy, or

a delicatessen does not compel it also to tolerate every other "commercial use", including pornography peddlers and live nude shows.

This position was rejected in 1981 and no majority has adopted it in any case since then, including *Barnes.* Suggesting that *Barnes* now permits communities to ban valuable expression to assert the perceived morality of a majority greatly exaggerates the holding of *Barnes* as well as its precedential authority.

In deciding the instant cause, this court is constrained by the letter of the Constitution which provides, "Congress shall make no law ... abridging the freedom of speech." U.S. Const., amend I. Sound principles of interpretation dictate that this court carefully regard the authority of *Barnes.* Where First Amendment rights are involved, a court is ill-advised to permit the censorship of expression based on mere predictions of how the Supreme Court would have resolved a question which it was not presented and on which it did not speak. To engage in such a speculative enterprise when the predicate Supreme Court opinion was itself unable to garner a majority of the Court is open to great question.

The position argued by the City requires this court to import to *Barnes* a degree of authority which that decision lacks. Likewise, the City attributes to *Barnes* a resolution of issues which were not, in fact, before that Court. As those issues are now before this court and the decision of this court must reflect not merely the result of one opinion but the reasoning of a long line of opinions, the result in this cause must necessarily differ from the result in *Barnes.*

## CONCLUSION

Akron's nudity ordinance is unconstitutional, as applied to plaintiff, because Akron fails to satisfy the reasoning articulated in the narrowest concurrence in *Barnes.* Akron did not consider any evidence of secondary effects. Implying secondary effects in the instant case is improper because every lawmaker did testify so there is no ambiguity as to what was and was not considered by Council.

For the same reason, Akron's ordinance is unconstitutionally overbroad. And in this context, even if the court were authorized to attribute non-evidential deliberations to City Council, it would be improper to do so because the court is aware of no secondary effects relating to non-adult entertainment containing nudity or the other proscribed conduct. Consideration of plaintiff's other arguments regarding the indecency ordinance would be mere surplusage.

This court's analysis of the Akron ordinance is appropriate given the nature of plaintiff's constitutional attack. Under our constitution, it is not sufficient that only the ends of government be proper; the *means* utilized must also withstand scrutiny. This court is sympathetic with the desire of Council and the citizens of Akron to preserve the integrity of their neighborhoods and sustain long-held moral traditions. Nothing in this opinion is intended to suggest that it is wrong or improper for Council or the citizens to defend these values which in a very real sense define and distinguish one community from another. However, in the instant cause, the means to which Akron resorted are improper.

In the interest of resolving this matter as expeditiously as possible, the court will deal with plaintiffs challenge of Akron's licensing statute in a separate order. Given the City's seeming reluctance to defend the licensing ordinance in closing arguments and prior concessions by the City that the ordinance clearly has troubling provisions, this court suggests that the parties avail themselves of the forthcoming delay and attempt to resolve the infirmities perceived by the parties to avoid further judicial intervention in the affairs of Council.

Plaintiff's motion is GRANTED in part. The City of Akron is hereby enjoined from enforcing its public indecency statute, A.C.C. § 133.06.

IT IS SO ORDERED.