COMMONWEALTH of Pennsylvania,
Appellee,

v.

Julie Rene MAKER, Appellant.

COMMONWEALTH of Pennsylvania,
Appellee,

v.

James Darrell LOUGHARD, Appellant.

COMMONWEALTH of Pennsylvania,
Appellee,

v.

Rose Marie BAILEY, Appellant.

COMMONWEALTH of Pennsylvania,
Appellee,

v.

Clyde Ronald LOUGHARD, Appellant.

COMMONWEALTH of Pennsylvania,
Appellee,

v.

Shelly Ann GRUMBLING, Appellant.

COMMONWEALTH of Pennsylvania,
Appellee,

v.

Harley D. CLEMENT, Appellant.

Superior Court of Pennsylvania.

Argued March 24, 1998.

Filed July 13, 1998.

Reargument Denied Sept. 22, 1998.

Lawrence J. Casella, Pittsburgh, for appellants.

Carol Hanna, Asst. Dist. Atty., Indiana County, for the Com., appellee.

Before POPOVICH, ORIE MELVIN and BROSKY, JJ.

POPOVICH, Judge:

The appellants (Julie Renee Maker, Rose Marie Bailey, Shelley Ann Grumbling, Harley D. Clement, James Darrell Loughard, and Clyde Ronald Loughard) appeal the judgment of sentence (costs of $76.02 and a fine of $300.00 each) for violating 18 Pa. C.S.A. § 7329(a)'s prohibition against a "bottle club" offering "lewd, immoral, or improper" entertainment "for profit or pecuniary gain". The appellants claim: 1) the evidence was insufficient to convict; 2) the statute violates the Equal Protection clause; 3) the statute violates the First Amendment's right of assembly; and 4) the Commonwealth extinguished a "non-conforming use" through the prosecution of a criminal statute without compensating the owner. We affirm in a case of first impression.

Viewing the evidence in a light most favorable to the verdict-winner and drawing all reasonable inferences therefrom, the facts indicate that at 9:00 p.m. on the 9th day of April, 1997, Pennsylvania State Troopers Harry B. Keffer, III, Michael E. Richardson and Robert Erdely, acting upon a complaint, proceeded undercover to "Runway 56" in Indiana County to investigate alleged violations of Section 7329. The trio gained entry after paying Harley $15.00 each. Harley activated an electronically controlled door to

access the premises and stated he was the "on-duty manager". Once inside, the troopers observed three females behind a counter with Harley and James. The troopers sat to await the entertainment.

The first dancer (Grumbling) took stage at 9:15 p.m. She removed all of her clothing save for footwear. While dancing, she touched her vagina and waited for patrons to "tip" her. She then removed dollars of various denominations from patrons' hands by squeezing her breasts together. Her act was completed by 9:35 p.m. The second dancer (Maker) took the floor 5 minutes later and completed the same type of performance by 10:00 p.m. The final performer (Bailey) engaged in identical acts as her predecessors.

While in the club, the troopers consumed beer ("a couple mouthfuls") they brought into the establishment as did other patrons. Trooper Erdely testified that Harley was "behind an area that was blocked off f[rom] the general public, he was at a cash register, and there was a window [through which] he collect[ed] the money ... and let[ ] people in by buzzing them into the establishment." During the evening, while Harley supervised "lap" dances[1] performed in a private area of the club, James "was left alone to tend the register and was in front of the window where money [wa]s to be received." "Later that evening[, James] redirected a roll-away flatbed pickup, pointed him to the other end of the [parking] lot so that the customers could exit because [it] was blocking traffic." Also, James stated to the troopers that "he was a relative of Clyde Loughard, the owner."

It was not until the troopers were leaving the club that Clyde Ronald Loughard arrived, stated he was the "owner of Runway 56" and "disputed the fact that the girls were employees, agents or in any way associated with Runway 56." Also, Clyde asked if the troopers had disclosed their names and badge numbers in the club because "[h]e was concerned about the interworkings of the business." Clyde was issued a citation, identical to those filed against the dancers and

the other two men, for violating Section 7329(a). All were found guilty and fined by a District Justice. The case was appealed to the Court of Common Pleas of Indiana County, which resulted in a trial de novo and a finding of guilty. Sentence was imposed and this appeal ensued.

In assessing the sufficiency of the evidence, a review of Section 7329(a) is necessary and provides: "[n]o bottle club operator or servants, agents or employees of the same shall knowingly permit on premises used as a bottle club or in any place operated in connection therewith any lewd, immoral or improper entertainment." The term "bottle club" is defined in relevant part as:

> An establishment operated for profit or pecuniary gain, which has a capacity for the assemblage of 20 or more persons and in which alcoholic liquors, alcohol or malt or brewed beverages are not legally sold but where alcoholic liquors, alcohol or malt or brewed beverages are either provided by the operator or agents or employees of the operator for consumption on the premises or are brought into or kept at the establishment by the patrons or persons assembling there for use and consumption. The term shall not include a licensee under the ... Liquor Code or any organization as set forth in section 6 of the ... Solicitation of Funds for Charitable Purposes Act.

18 Pa.C.S.A. § 7329(c).

Giving the statute a common sense reading, knowledgeable that the Legislature intended a result that is not absurd or makes a portion of a statute ineffectual (1 Pa.C.S.A. § 1922), the thrust of the "bottle club" law is to prohibit "lewd, immoral or improper entertainment" in any place operated for pecuniary gain having a capacity to house 20 or more people consuming alcohol.

Here, the Commonwealth established that "Runway 56" was accessible only upon payment of $15.00 by each patron and allowed the consumption of alcohol brought onto the premises. It had the capacity to hold one hundred people and offered entertainment in

---

**1.** Trooper Erdely described the "lap" dance as "when a customer pays an extra fee, he can have

a one-on-one dance with a girl in a private area."

the form of nude dancing allowing for interaction between patrons and performers by the exchange of money. Those patrons desiring more intimate contact were permitted a "lap" dance for a fee, which was supervised by management to assure the safety of the dancer.

It is uncontroverted that Clyde admitted he was the "owner", and, thus, "club operator" of "Runway 56" for purposes of Section 7329(a). Harley stated he was the "manager", operated the cash register, accepted money from patrons before access was permitted to the premises and oversaw "lap" dances. Likewise, James had access to the case register and monitored the parking facilities to avoid patrons blocking traffic.

Based on the preceding, it was reasonable for the trier-of-fact to infer that: 1) "Runway 56" (having the capacity for assembling 20 or more people who consumed alcohol, paid money to enter and see entertainment) was a "bottle club"; 2) Clyde was the "operator" of the club; 3) the entertainment provided was "lewd, immoral or improper"; and 4) James and/or Harley (supervising the cash register, dancers, physical plant and parking facilities) were "agents" of the club.

■ An agency relationship existed despite the lack of proof by the Commonwealth that Harley and James received a stipend from Clyde for services. In establishing agency, one need not furnish direct proof of specific authority, provided it can be inferred from the facts that at least an implied intention to create the relationship of principal and agent existed. Moreover, existence of the relationship may be found in acquiescence or failure to disavow. 1 P.L.E. Agency § 4.

■ It is to be recalled that Clyde did not disavow knowing what was occurring on the premises or that Harley and James were not managing the club. Even though no writing was produced, the principal-agency relationship may be predicated upon the conduct of the parties, as was the case here. *Id.* at § 2. Thus, we hold evidence of a principal-agent relationship existed to contravene the statute.

■ Similarly, the appellants' claim that the Commonwealth failed to establish they ran a business for "profit or pecuniary gain" is belied by the record: Money was accepted from patrons to access the establishment; services performed by dancers ("lap" dance) were supervised; and the flow of cash into the register was monitored. Viewed in concert, all of the preceding is consistent with operating a business for "pecuniary gain". No evidence exists that the operation was a philanthropic entity geared toward charitable work or communal goals of decency and good morals. Therefore, whether the operation was profitable is of no moment because the statute does not require a business to have liquidity (written in the alternative, "profit *or* pecuniary gain") to come within its ambit.

■ Additionally, we hold that dancing before an audience at such a distance as to allow the performers to remove money from a patron's hand while nude and touching their vaginas is "erotic". *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 570, 581, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Even so, erotic performances are presented at these establishments and similar clubs without any interference from the Commonwealth, so long as the performers wear a scant amount of clothing. 18 Pa.C.S.A. § 5903. When the dancers do not don "pasties" and "G-strings", the erotic message is more graphic. Nonetheless, one of the perceived evils that Pennsylvania seeks to address with the "bottle club" statute is not erotic dancing, but public nudity. *See* Section 7329(c)(3), which describes as "lewd, immoral or improper entertainment": "Scenes wherein a person displays or exposes to view any portion of the pubic area, anus, cleft of the buttocks, vulva, genitals or any portion of the female breast directly or laterally below the top of the areola."

■ The governmental interest served is societal disapproval of nudity in public places and among strangers. The statutory prohibition is tailored to such offensive behavior. As a result, Pennsylvania's requirement that dancers refrain from "lewd, immoral or improper" performances is a modest request; and the bare minimum necessary to achieve the Commonwealth's purpose of preventing

624 ■

nude dancing in public is being accomplished without offending the First Amendment's freedom of expression or assembly. *Barnes, supra ; see also* note 2, *infra.*

■ Neither do we find that the Equal Protection Clause of the U.S. Constitution is compromised by the "bottle club" law's prohibition against "lewd, immoral or improper entertainment", which the appellants argue is permitted in the case of liquor code licensees and organizations soliciting funds for charitable purposes.  This is just not the case.

■ Legislation enacted by the General Assembly carries a strong presumption of constitutionality, and the party challenging the constitutionality of any statute bears the heavy burden of demonstrating that the statute is clearly, palpably and plainly unconstitutional. *Commonwealth v. Burnsworth*, 543 Pa. 18, 669 A.2d 883, 886 (1995).  The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly. *Curtis v. Kline*, 542 Pa. 249, 666 A.2d 265, 267 (1995).  Under equal protection scrutiny, a classification which does not impermissibly interfere with a fundamental right or disadvantageously offset a suspect class will be upheld as long as it passes a rational relationship test. *Id.*

Courts which have been presented the issue of nude dancing in public have held that it involves neither a suspect class nor a fundamental right sufficient to invoke a strict scrutiny test. *Barnes, supra.*  Rather, because the behavior sought to be regulated relates more to "conduct" and not freedom of expression protected by the First Amendment, the passage of a rational relationship test is all that needs occur. *Id.*  We see no need to embark on a "rational relationship" excursion because Section 7329(a)'s "lewd, immoral and improper entertainment" is prohibited in "bottle clubs" as well as in the case of liquor licensees or charitable organizations.

To explicate, to read Section 7329(a) to apply only to alcohol consuming businesses operated for pecuniary gain but exclude (exempt) liquor licensees and charitable entities

is "absurd" and a result not contemplated by the Legislature. 1 Pa.C.S.A. § 1922.

Liquor licensees are regulated exclusively by the Pennsylvania Liquor Control Board (PLCB).  Under the PLCB's ever vigilant auspices, it is unlawful "[f]or any [liquor] licensee, his servants, agents or employees * * * to permit in any licensed premises any lewd, immoral or improper entertainment, regardless of whether a permit to provide entertainment has been obtained or not."  47 P.S. § 4–493(10).  The same result obtains with respect to charitable organizations, whose allowance of identical conduct would be prohibited by the Crimes Code at 18 Pa.C.S.A. § 5903.  Accordingly, reading the three statutes in harmony allows for equal treatment under the law prohibiting acts considered to be "lewd, immoral or improper".  34 P.L.E. Statutes, §§ 142, 143, 144, 158 and 159 (1960).

Stated otherwise, because the conduct complained-of would be improper whether performed in a licensed establishment, at a charitable function or a "bottle club" regulated by Section 7329(a), as applied the statute assailed is not violative of the Equal Protection Clause. *Id.* (Statutes facially at odds are to be read harmoniously, where possible, to preserve the integrity of the law without doing violence to either one); Saffer, Obscenity Law and the Equal Protection Clause: May States Exempt Schools, Libraries, and Museums From Obscenity Statutes?, 70 N.Y.U.L.Rev. 397 (1995); Note, Regulation of Nude Dancing in Bring Your Own Bottle Establishments in the Commonwealth of Pennsylvania: Are the Commonwealth's Municipalities Left to Fend for Themselves?, 99 Dick.L.Rev. 169 (1994).

Next, we examine the argument concerning the absence of any evidence of an exchange of revenue between the owner or his agents and the dancers for services rendered as indicative of neither a master-servant, agent-principal nor employer-employee scenario.  Specifically, the claim is the dancers were private contractors performing for "tips" from the patrons and none was under the control of the business, but each acted independently of management to bring them

outside the sphere of "a servant, agent or employee" for purposes of Section 7329.

■ Evidence of an employer-employee relationship *vis-a-vis* that of an independent contractor is controlled by the particular facts of each case. There are certain criteria recognized as useful in determining the relationship, with the factor of control being of basic importance. *Mladinich v. U.S.*, 379 F.Supp. 117, 119 (S.D.Miss.1974).

> In determining whether a person employed to do certain work is an independent contractor or a mere servant is the control over the work which is reserved by the employer. Whether one is an independent contractor depends upon the extent to which he is, in fact, independent in performing the work. Broadly stated, if the contractor is under the control of the employer, he is a servant; if not under such control, he is an independent contractor.

*Id.*; *Matcovich v. Anglim*, 134 F.2d 834, 837 (9th Cir.1943)("... the really essential element of the relationship [of master and servant] is the right of control—the right of one person, the master, to order and control another, the servant, in the performance of work by the latter, and the right to direct the manner in which the work shall be done.").

For purposes of the Fair Labor Standards Act, the Court in *Reich v. Priba Corp.*, 890 F.Supp. 586, 594 (N.D.Tex.1995), stated that topless dancers were not independent contractors at a club and this fact required reimbursement of back wages owed the entertainers. Likewise, in *Matcovich*, supra, the Court discounted an agreement executed between dancers and the owner labelling their relationship as a license to perform and not as employer-employee for Social Security tax purposes. However, in *JJR, Inc. v. U.S.*, 950 F.Supp. 1037 (W.D.Wash.1997) and *Marlar, Inc. v. U.S.*, 934 F.Supp. 1204 (W.D.Wash.1996), the same Court denied the government's motion for summary judgment that nude and semi-nude performers were employees of the club owner. Material issues of fact existed concerning payment of wages and the classification of the performers for Internal Revenue Service purposes.

At bar, it is uncontroverted that Trooper Erdely had conducted numerous undercover investigations of "Runway 56" before the April 9th visit resulting in the filing of citations against the appellants, *and on each occasion a "fee" was collected to enter the establishment and "[t]hese [same] workers were present."* Also, when the dancers were not performing they stayed within an enclosed area not accessible to patrons but was the location for the cash register and where James and Harley stood. Further, even though Clyde disputed the "employee" status of the people inside "Runway 56", it is uncontested that when a customer paid an extra "fee" (over and above the admission "fee" paid to Harley) he was permitted a "lap" dance with a girl in a private section of the club. And, this service was "supervised" by Harley "to make sure that the girl was all right."

■ Admittedly, each fact in isolation does not establish the existence of any (employee, servant or agent) relationship between the owner/principal (Clyde) or the managers/agents (James or Harley) and the dancers. However, when viewed en toto *and* drawing all *reasonable inferences* from the facts adduced (and not creating a "presumption" that all nude dancers are not independent contractors as requested by the Commonwealth), we hold the dancers were "servants" who were directed by the owner's agent (Harley) when and where to dance, and, for a set fee paid to management, to perform "lap" dances in a specified location of the establishment under the watchful eye of management to make sure nothing happened to dancer or patron.

Lastly, we will address the claim the Commonwealth extinguished a "nonconforming use" of a business through prosecution of Section 7329 and should be required to compensate the business owner for such a taking. Reliance is had upon *PA Northwestern Distributors v. Zoning Hearing Board*, 526 Pa. 186, 584 A.2d 1372 (1991), which held that an amortization provision in a zoning ordinance constituted a "taking" of property entitling the owner to remuneration. Here, unlike *PA N.W. Dist.*, we are not dealing with the enforcement of a zoning ordinance, but even if, arguendo, we were to equate such with the enforcement of a criminal statute, the end result would not be the same.

■ *PA N.W. Dist* dealt with an owner's "lawful" use of his property made "nonconforming" by a subsequently enacted ordinance. Sub judice, under Section 7329 and Section 5903 of the Crimes Code, the dancers' performances were "lewd" and "obscene" so as to label the owner's use of his property "unlawful". This negates the requirement for compensation.

Judgment of sentence affirmed.[2]

ORIE MELVIN, J., concurs in the result.

**2.** In regard to the constitutional attack mounted against Section 7329, even though our earlier decision to dispense with such a review, we have applied the four-part test set-forth in *U.S. v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) and followed in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) and conclude the statute passes constitutional muster. First, the Commonwealth's substantial interest in combating the secondary effects (prostitution, sexual assault and attracts other criminal activity) of adult entertainment establishments of the sort typified by "Runway 56" promotes the health, safety and welfare of the citizenry. *Pap's A.M. v. City of Erie*, 674 A.2d 338, 343 (Pa.Cmwlth.1996). Second, the restraint furthers a substantial government interest, of which no specific data need be provided to demonstrate that harmful secondary effects correlate to the presence of establishments which provide adult entertainment. *Id.*; *Barnes, supra.* Third, the government's interest is unrelated to the suppression of free expression, which the Court in *Barnes* found that a statute which bans public nudity is not related to the suppression of the erotic message, i.e., the expressive component of the dance. Here, like in *Barnes*, the request that the dancers not engage in "lewd, immoral or improper entertainment" (manifested in the form of nude dancing) is not related to the suppression of the erotic expression, but is linked to the avowed purpose of safeguarding the public from the harmful secondary effects associated with adult entertainment. Fourth, the restriction of nude dancing (requiring the use of "pasties" and "G-strings") is an incidental limitation on some expressive activity while furthering a substantial government interest. *Barnes, supra.*

Therefore, Section 7329 satisfies the requirements of *O'Brien* and does no violence to the dancers' First Amendment rights, despite the peripheral restriction on a form of expression.