J-A22011-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ELSIE CLEMENTSON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| EVANGELICAL MANOR D/B/A WESLEY ENHANCED LIVING PENNYPACK PARK | |
| Appellant | No. 299 EDA 2017 |

Appeal from the Order Entered December 19, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 160601775

BEFORE:  BOWES, LAZARUS AND PLATT,* JJ.

MEMORANDUM BY BOWES, J.: **FILED MARCH 29, 2018**

Evangelical Manor d/b/a Wesley Enhanced Living Pennypack Park (the "Facility") appeals from the December 19, 2016 order denying its petition to compel arbitration.[1]  After thorough review, we affirm.

Elsie Clementson filed this negligence action seeking damages for a fractured tibia that she sustained in a fall while she was a resident at the

---

[1] The trial court's order is final and appealable pursuant to Pa.R.A.P. 311(a)(8), which permits an interlocutory appeal from any order made appealable by statute.  ***See Midomo Co., Inc. v. Presbyterian Housing Co.***, 739 A.2d 180, 183-84 (Pa.Super. 1999).  The Uniform Arbitration Act, 42 Pa.C.S. §§ 7301 *et seq.*, provides that an appeal may be taken from "[a] court order denying an application to compel arbitration. . . ." 42 Pa.C.S. § 7320(a)(1).

\* Retired Senior Judge specially assigned to the Superior Court.

Facility. The Facility moved to compel arbitration pursuant to a clause in the Admission Agreement, which was signed by Ms. Clementson's daughter, Joanne Reilly.[2] Ms. Reilly did not act pursuant to a power-of-attorney.

The circumstances preceding and surrounding the execution of the Admission Agreement are as follows. On February 16, 2012, Ms. Reilly signed the Facility's Responsible Person Agreement ("RPA") "to facilitate the provision of care to the Resident," her mother, Elsie Clementson. Responsible Person Agreement, at 1. The RPA provided that, "the responsible person affirms that he or she has access to Resident's income and resources and the Resident's income and resources are available to pay for Resident's care." *Id*. at 1¶3. The Responsible Person agrees to pay for the costs of the stay from Resident's income and resources in accordance with the Admission Agreement until the costs are paid by other sources, and to apply for and submit the documentation required to obtain benefits. *Id*. If Responsible Person fulfills his or her obligations under that Agreement, "she shall not be held personally liable for the Resident's charges." *Id*. at 2. If, however, Responsible Person does not fulfill the Agreement, "she shall be liable" to the Facility for any losses it sustains due to Responsible Person's

---

[2] The record indicates that the form agreements were preprinted with the name "Joanne Riley," but signed by "Joanne Reilly." There was no indication on the signature page that Joanne Reilly signed in her capacity as the Responsible Person for her mother.

breach. *Id*. In short, the RPA obligated the Responsible Person to fulfill the duties of the Resident under the Admission Agreement, most of which were financial in nature, and subjected the Responsible Person to liability for failure to do so.

On February 21, 2012, Ms. Reilly was asked by the Facility to execute the Facility's Admission Agreement. The Agreement details the nature of the services provided, the charges, billing, Medicare and Medicaid, and the "Obligations of Responsible Person." The latter provision states in pertinent part:

> The Resident has the right to identify a Responsible Person (usually the Agent in the Resident's Power of Attorney or Guardian), **who shall be entitled to receive notice in the event of transfer of discharge or material changes in the Resident's condition, and changes to this Agreement.** Resident elects to name JOANNE RILEY of PHILADELPHIA, PA [*address*], as the Responsible Person. **The Resident's selected Responsible Person shall sign this Agreement and the Responsible Person Agreement in recognition of this designation with the intent to be legally bound by all provisions in this Agreement and the Responsible Person Agreement.**

Admission Agreement, ¶4.1 (emphasis added).

Paragraph 20 of the Admission Agreement is entitled "Community's Grievance Procedure," and provides that if the Resident, Resident's Attorney-in-Fact, or Responsible Person believes that Resident is being mistreated or her rights violated, they are to make the complaint known to the Director of Nursing or Administrator. Such notice is a prerequisite to

arbitration. It states further that any claim for personal injuries for inadequate care or medical malpractice while in the Facility are to be resolved "exclusively by arbitration." Paragraph 20.3(b). The Agreement explains that this means that the Resident is relinquishing her right to a jury trial and will not be able to file a lawsuit. Rather, arbitration administered by ADR Options, Inc. pursuant to its rules, at a site chosen by the Facility, is the only option. The parties are to split costs and each bear their own legal fees. The Agreement provides further that "Resident, or Resident's spouse or personal representative in the event of Resident's incapacity, have the right to rescind this arbitration clause" by notifying the Facility in writing, by certified mail, within thirty days of signing. *Id*. at ¶20.3(h).

The Admission Agreement contains an integration clause providing that the Admission Agreement, the Application Agreement,[3] and the RPA are the entire agreement and understanding between the parties. *Id*. at ¶23.4. The Facility reserved, however, the right to modify unilaterally the terms of the Agreement to conform to subsequent changes in the law, regulation, or operations. *Id*. at ¶23.5.

At the time the aforementioned documents were executed, Ms. Reilly was not Ms. Clementson's attorney-in-fact. The parties to the RPA and the Admission Agreement were Ms. Reilly and the Facility. Later, in 2014, Ms.

---

[3] The Application Agreement is not contained in the certified record.

Clementson executed a durable power-of-attorney conferring attorney-in-fact status upon her daughter. Based on the foregoing, the trial court denied the petition to compel arbitration finding there was no express or implied agency based on the RPA. The court also found that the power-of-attorney executed in 2014, more than two years after the execution of the Admission Agreement containing the arbitration clause, was not retroactive as the powers designated therein were not explicitly retroactive. Furthermore, Ms. Reilly did not have apparent authority to act as there was no manifestation by the principal, Ms. Clementson, establishing such authority. Finally, the trial court found no agency by estoppel, as there was no evidence that Ms. Clementson was present when the paperwork was signed, that the agreements were presented to her, or that she knew what they contained. Absent proof that Ms. Clementson knew that her daughter purportedly agreed to arbitrate, her failure to disavow her daughter's authority to agree to same did not create agency by estoppel.

The Facility timely appealed, raising one question for our review: "Did the trial court err by failing to compel binding arbitration of the claims brought by [Ms. Clementson] against the Defendant Facility pursuant to the Facility's valid and binding Admission/Arbitration Agreement?" Appellant's brief at 4.

Our review of the denial of the petition to compel arbitration "is limited to determining whether the trial court's findings are supported by substantial

evidence and whether the trial court abused its discretion in denying the petition." *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651, 654 (Pa.Super. 2013). We apply a two-part test. "First, we examine whether a valid agreement to arbitrate exists. Second, we must determine whether the dispute is within the scope of the agreement." *Id*. at 654-55. Since arbitration is a matter of contract, a party cannot be compelled to arbitrate unless he or his agent have agreed to do so. *Bair v. Manor Care of Elizabethtown, PA, LLC*, 108 A.3d 94 (Pa.Super. 2015). "Whether an agreement to arbitrate disputes exists is a question of law." *Neuhard v. Travelers Ins. Co.*, 831 A.2d 602, 604 (Pa.Super. 2003). Thus, our standard of review is limited to determining whether the trial court committed an error of law and our scope of review is plenary. *McNulty v. H&R Block, Inc.*, 843 A.2d 1267, 1271 (Pa.Super. 2004).

The following principles govern arbitration agreements. The party alleging the existence of a valid arbitration agreement has the burden of proof on that issue.[4] *Washburn v. Northern Health Facilities, Inc.*, 121 A.3d 1008 (Pa.Super. 2015); *Wisler v. Manor Care of Lancaster PA, LLC*,

---

[4] In some instances, courts have permitted discovery on the issue of the enforceability of an arbitration agreement. *See Bair v. Manor Care of Elizabethtown, PA, LLC*, 108 A.3d 94 (Pa.Super. 2015). In other cases, an evidentiary hearing has been conducted by the court. The petition to compel arbitration did not allege facts that, if proven, would establish that the clause was binding on the Plaintiff herein, and the Nursing Home did not request discovery or an evidentiary hearing.

124 A.3d 317 (Pa.Super. 2015). In addition, "arbitration agreements are to be strictly construed and not extended by implication." *Fellerman v. PECO Energy Co.*, 159 A.3d 22, 26-27 (Pa.Super. 2017). "When parties have agreed to arbitrate in a clear and unmistakable manner, every reasonable effort should be made to favor the agreement unless it may be said with positive assurance that the arbitration clause involved is not susceptible to an interpretation that covers the asserted dispute." *Id*.

First, we must determine whether the trial court correctly concluded that Ms. Clementson did not agree to arbitrate, since she did not sign either the RPA or the Admission Agreement containing the mandatory arbitration clause. Ms. Reilly signed the RPA in her personal capacity; she executed the Admission Agreement in her capacity as the Responsible Person. The Facility contends that Ms. Reilly had express, implied, and apparent authority, as well as authority by estoppel, to act as her mother's agent and bind her to the arbitration clause in the Admission Agreement.

The basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking, and the understanding of the parties that the principal is to be in control of the undertaking. *Washburn*, *supra* at 1010. As we held in *Walton v. Johnson*, 66 A.3d 782, 786 (Pa.Super. 2013), "[a]n agent cannot simply by [her] own words, invest [herself] with apparent authority. Such authority emanates from the action of the principal and not the agent." *Id*. at 787.

Furthermore, "[t]he relationship of agency cannot be inferred from mere relationship or family ties unattended by conditions, acts or conduct clearly implying an agency." *Id*. We explained in *Walton*:

> An agency relationship may be created by any of the following: (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel. Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters. *See Bolus v. United Penn Bank*, 363 Pa.Super. 247, 525 A.2d 1215 (1987). Implied authority exists in situations where the agent's actions are 'proper, usual and necessary' to carry out express agency. *See Passarelli v. Shields*, 191 Pa.Super. 194, 156 A.2d 343 (1959). Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act. *See Turner Hydraulics v. Susquehanna Construction Co*., 414 Pa.Super. 130, 606 A.2d 532 (1992). Authority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal. *See Turnway Corp. v. Soffer*, 461 Pa. 447, 336 A.2d 871 (1975).

*Id*. Agency is not assumed merely because one person does an act for another. *Walton*, *supra* at 787 (mother, who was not acting pursuant to a power-of-attorney and had no express authorization when she signed an arbitration agreement on behalf of her comatose daughter, was not acting as daughter's agent, and agreement was unenforceable).

The Facility cites *Commonwealth v. Maker*, 716 A.2d 619 (Pa.Super. 1998), for the proposition that the principal/agent relationship can be inferred from facts indicating the intention to create that relationship, such as acquiescence or failure to disavow. Inferences that Ms. Reilly was her

mother's agent for purposes of the Admission Agreement containing the arbitration clause can be drawn, according to the Facility, from the signed Admission Agreement itself, the RPA, the 2014 durable power-of-attorney, the close familial relationship, and Ms. Clementson's payment for and acceptance of its services.

Ms. Clementson counters that the court in **Maker**, **supra**, found an agency relationship based upon the conduct of the principal, rather than the actions of the alleged agent. She argues that the RPA signed by her daughter did not supply the requisite authority for Ms. Reilly to agree to arbitration on her behalf, as apparent authority must emanate from the principal, rather than the agent. The principal must manifest "assent that another person (the agent) will act on the principal's behalf subject to the principal's control, and the agent agrees to do so." **Wisler**, **supra** at 323-24. Ms. Clementson maintains that the Facility offered no evidence of any words or conduct on her part at the time that could be construed as conferring authority upon her daughter to bind her to the agreement to arbitrate.

Moreover, Ms. Clementson contends that the 2014 durable power-of-attorney does not cure that deficiency. Since the later-executed power-of-attorney did not contain any provision that it was to be retroactively applied, she maintains it was not retroactive. **Twp. of N. Fayette v. Guyaux**, 992 A.2d 904, 905 (Pa.Super. 2010). Finally, according to Ms. Clementson,

agency by estoppel would require a showing that she knew or should have known that her daughter waived her jury-trial rights. There was no allegation or showing of such knowledge. Thus, absent a power-of-attorney or a guardianship, evidence of Ms. Clementson's conduct at the time, or that she knew about the arbitration agreement, **Walton**, **supra**, negates any agency relationship. Ms. Reilly signed the RPA, which bound her, not her mother. It did not create an agency relationship with her mother. She signed the Admission Agreement in her capacity as the Responsible Person, a power that did not emanate from her mother.

As the trial court correctly concluded, neither the RPA nor the 2014 durable power-of-attorney created either an express or an implied agency. Ms. Clementson did not sign the RPA or any other document conferring authority upon her daughter, and "[a]n agent cannot, simply by [her] own words, invest [herself] with apparent authority." **Turnway Corp. v. Soffer**, 336 A.2d 871, 876 (Pa. 1975). The trial court also correctly noted that the later-executed power-of-attorney was not retroactive as the powers designated therein were not explicitly retroactive. Thus, the trial court properly concluded that Ms. Reilly lacked apparent authority to act as there was no manifestation by the principal, Ms. Clementson, establishing such authority.

We note further that the Facility did not allege facts or circumstances, or adduce evidence from which one could reasonably infer that Ms.

- 10 -

Clementson consented to her daughter signing the Admission Agreement. There is no evidence of Ms. Clementson's mental and physical condition at the time. Thus, we cannot discern whether Ms. Clementson was mentally and/or physically incapable of signing the Admission Agreement herself, or mentally competent to authorize her daughter to act as her agent. In addition, there is no indication that she was present when the Admission Agreement was signed, that she knew what it contained, or that she was provided with a copy.

Finally, we find no agency by estoppel simply because Ms. Clementson did not disavow the arbitration agreement or because she benefitted from the services provided. In *Petersen v. Kindred Healthcare, Inc.*, 155 A.3d 641 (Pa.Super. 2017), we considered whether agency by estoppel applied to compel arbitration where the patient's daughter signed the relevant paperwork. The daughter was named as a successor agent on the patient's power-of-attorney. On appeal, Kindred, similar to the arguments lodged herein, claimed that Petersen's acceptance of medical benefits, the documents signed by her daughter, and the admission agreement itself, created an agency relationship binding her to arbitration. We observed,

> Here, Kindred's argument on this issue is misplaced. While agency by estoppel is essentially a determination of agency by after-the-fact actions by the **principal**, Kindred focuses its argument on the actions of [Petersen's daughter]. As such, its claim is fatally flawed.

In any event, Kindred offered no evidence to demonstrate that Petersen acted negligently or had any reason to believe that Kindred was acting upon a mistaken belief as to [the daughter's] authority – or lack thereof – under the [power-of-attorney]. Peterson had no knowledge of the circumstances surrounding the execution of the ADR agreement. She was not present at its execution, and [her daughter] did not show the ADR agreement to her after the fact . . . . Kindred never presented the ADR agreement to Petersen for ratification and there is no basis to believe that she knew or should have known about the agreement.

*Petersen*, *supra* at 647 (internal citations omitted, emphasis in original).

Since Kindred failed to establish that Petersen was negligent in failing to correct Kindred's mistaken belief about her daughter's authority, we found that agency by estoppel did not apply. *See also Washburn*, *supra* (absent evidence that decedent knew his wife signed arbitration agreement, no basis to infer that she was authorized to do so).

Herein, there was no assertion that Ms. Clementson was unable to sign the Admission Agreement, that she was aware that Ms. Reilly was signing documents on her behalf, or that she knew or should have known that the Admission Agreement contained an arbitration clause. The Facility did not allege or proffer evidence that it later presented it to Ms. Clementson for ratification. Thus, the record does not support a finding of agency by estoppel.

In sum, we find no error in the trial court's finding that there was no agency, and hence, no binding agreement to arbitrate. The RPA was an agreement between the Facility and Ms. Reilly personally; she did not

execute it pursuant to any authority conferred upon her by her mother. By executing that document, Ms. Reilly agreed to submit the necessary paperwork to facilitate reimbursement from applicable insurance, to pay any amounts owing, and to be personally liable for non-payment.

Similarly, the Admission Agreement was an agreement between the Facility and Ms. Reilly as the Responsible Person. As the Responsible Person, Ms. Reilly had no authority from her mother to act on her behalf or bind her to the terms of the Admission Agreement. While "a party can be compelled to arbitrate under an agreement, even if he or she did not sign that agreement, if common-law principles of agency and contract support such an obligation on his or her part[,]" **Wisler**, **supra** at 323, there was no proof of agency herein. There is no evidence that Ms. Clementson authorized Ms. Reilly to agree to arbitrate on her behalf, and thus, no agreement to arbitrate that is binding upon Ms. Clementson.

Accordingly, we need not reach the alternative basis for affirmance advanced by Ms. Clementson, *i.e.*, that the arbitration agreement was an unenforceable contract of adhesion.[5] We observe only that many of the characteristics of the arbitration agreement held to be conscionable in

_____

[5] The burden of proving unconscionability is upon the party challenging an agreement, with the ultimate determination to be made by the courts. **Salley v. Option One Mortg. Corp.**, 925 A.2d 115, 119-20 (Pa. 2007).

***MacPherson v. Magee Mem. Hosp. for Convalescence***, 128 A.3d 1209,

1213 (Pa.Super. 2015) (*en banc*), are not present herein.[6]

      Order affirmed.  Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/29/18

---

[6] For instance, the agreement to arbitrate in ***MacPherson v. Magee Mem. Hosp. for Convalescence***, 128 A.3d 1209, 1213 (Pa.Super. 2015) (*en banc*), was a separate document from the Admission Agreement and clearly identified as an arbitration agreement.  Moreover, arbitration was not mandatory, and the reader was informed that admission to the facility was not conditioned upon agreeing to arbitrate ("VOLUNTARY AGREEMENT: If you do not accept this Agreement, the Patient will still be allowed to live in, and receive services in, this Center.").  Here, by signing the Admission Agreement, the Resident or her agent agreed to arbitrate, and it is unclear whether a refusal to arbitrate would result in the denial of admission.

In ***MacPherson***, the jury trial waiver language was in bold type, much larger than the surrounding type, and thus, conspicuous.  Here, the agreement to arbitrate is located on page 10, in paragraph 20, of a fourteen page Admission Agreement.  It appears under the general designation "Community's Grievance Procedure."  The jury trial waiver is not in bold type or large font.

Unlike the agreement in ***MacPherson***, the Facility retained the right to choose the arbitration site and unilaterally modify the Admission Agreement containing the arbitration agreement, arguably making the latter more favorable to the drafting party.  The cost of arbitration is split under the Agreement herein, unlike the ***MacPherson*** agreement where the nursing home bore all of the costs.

- 14 -